## GURINSKY v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. April 4, 1919. Rehearing Denied October 7, 1919.)

No. 3296.

1. CRIMINAL LAW ⬤⇒400(4)—SECONDARY EVIDENCE OF WRITING—PAY ROLL.

The rule against secondary evidence of the contents of written instruments is less stringent, where the evidence is negative, as in the case of testimony that a certain column for signatures opposite 56 names on a pay roll was blank, than it is where the attempt is to reproduce orally the written language of an instrument, especially one that creates or disposes of rights.

2. CRIMINAL LAW ⬤⇒1169(10)—HARMLESS ERROR—EVIDENCE—SECONDARY EVIDENCE—CONTENTS OF PAY ROLL.

In a prosecution for violation of Penal Code, § 47 (Comp. St. § 10214), by embezzling moneys of the United States while acting as paymaster's clerk, admission of evidence for the government that certain pay rolls, the originals of which were shown to be in the possession of the government at Washington, did not contain receipt signatures after the names of 56 employés, held not reversible error, in view of negative character of evidence.

3. CRIMINAL LAW ⬤⇒723(5)—ARGUMENT OF COUNSEL.

Where the United States attorney in argument was permitted to characterize defendant, named Gurinsky, as a gambling Jew, against objection there was no evidence as to what race defendant belonged, it cannot be said that there was error; the name and circumstance of defendant's change of name having been some evidence of his race, while his appearance, accent, and demeanor may have been pertinent evidence.

4. EMBEZZLEMENT ⬤⇒47—JURY CASE.

In a prosecution for violation of Penal Code, § 47 (Comp. St. § 10214), by embezzling moneys of the United States while acting as paymaster's clerk, where there was evidence tending to show there was a shortage in the pay roll money, and that defendant was accountable, the trial court could not have properly directed verdict.

In Error to the District Court of the United States for the Western District of Texas; Duval West, Judge.

Mike Gurinsky, alias Jack Green, was convicted of embezzling money of the United States while acting as paymaster's clerk, and brings error. Affirmed.

C. A. Davies, of San Antonio, Tex. (Chambers & Watson, of San Antonio, Tex., on the brief), for plaintiff in error.

Hugh R. Robertson, U. S. Atty., of San Antonio, Tex.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. This is a writ of error from a judgment of conviction of the plaintiff in error for a violation of section 47 of the Penal Code of the United States (Act March 4, 1909, c. 321, 35 Stat. 1097 [Comp. St. § 10214]) by embezzling $3,360 of its moneys, while acting as paymaster's clerk in the office of the paymaster for the construction and repair division at Ft. Sam Houston, Tex.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Three grounds for the reversal of the judgment are insisted upon. They are: (1) That the government was permitted to prove the contents of certain pay rolls, the original being shown to be in the possession of the government at Washington; (2) that the United States attorney was permitted in his address to the jury to characterize the defendant as a "gambling Jew," when, as contended, there was no evidence of his race or nationality; and (3) the refusal of the District Judge to direct an acquittal.

[1, 2] 1. The evidence tended to show that the money embezzled was that used in making up the pay rolls of employés at Leon Springs and Kelly Field and Travis camps. The defendant, together with the government witnesses, Wood and Nayer and Hopkins, made up the rolls for the first two weeks of the month of May, 1918. The method was to take the names of the employés from the foremen's field time books and enter them from them into what was called the service or consolidated time book, exactly as and in the order that they appeared in the foreman's time book. From the service book the names were entered alphabetically upon the pay rolls by one man calling them from the service book to another, who wrote them on a typewriter on the pay rolls. After the pay rolls were prepared, envelopes were made out in corresponding number and names, and the money was counted and put into the envelopes and sealed. The envelopes were kept in a basket. Identification numbers were placed on the pay envelopes. When the man had signed or made a mark opposite his name on the pay roll, he was given his pay envelope, and his receipt on the pay roll was a voucher for the amount disbursed to him. One of the foremen, whose time book was used in making up the May pay roll, was George Roberts. The defendant had secured his time book from him early in the morning and had transferred the names of the men and amounts due them from the time book to the office service book or consolidated time book, from which the pay rolls were made. He made the transfer in the pay office early in the morning before the other pay clerks had arrived there. The names in the service book, taken from Roberts' time book, were in defendant's handwriting, as were also 60 names not found in Roberts' time book when it was put in evidence. When shown the 60 names involved in the controversy, after the shortage was discovered, the defendant, upon inquiry as to where he got them, stated that they came from Roberts' book.

The evidence tended to show that the pay envelopes for 56 of the 60 names were missing from the basket, after the men had been paid off, and that there were no signatures of any of the men who bore the 56 names on the pay roll. Each pay envelope of the 56 contained $60, and the missing 56 aggregated $3,360, the amount of the shortage. The government proved the fact that the pay rolls did not contain signatures for the 56 names by the witness Hopkins, who had compared the 56 names on a list taken from the pay envelopes or service time book with the pay rolls, with that result. The original pay rolls were not introduced, though in the government's possession at Washington, and objection was made to Hopkins' evidence as to their contents, as being secondary evidence.

The government had two propositions to establish: (1) The shortage; and (2) that defendant caused it. As to the fact of the shortage, the government did not rely alone upon the fact that the pay rolls were not receipted opposite the 56 names in question. Roberts testified that he had no men in his employ corresponding to the 56 names. His book showed no such names, and the absence of pages was accounted for and afforded no rational inference to the contrary. Inquiry failed to develop the presence of such employés in any of the camps within the paymaster's jurisdiction. The officer in charge was required to make good the shortage. The loss itself was established independently of Hopkins' evidence that the pay rolls were not receipted. This testimony as to the condition of the pay rolls did not reflect upon the question as to who caused the shortage, if there was one. If Hopkins had testified that there were signatures opposite the 56 names in defendant's handwriting, the case would have been presented differently. If the defendant contended that the rolls, if produced, would have shown 56 signatures on the pay rolls opposite the 56 names in a handwriting other than his, then it was his duty to require production of the rolls by the government, and, failing to do so, he has no complaint based on their absence.

It is also to be noted that Hopkins, in this respect, did not testify to what the pay rolls contained, and his testimony did not infringe the letter of the rule against the allowance of secondary evidence of the contents of a written instrument. He merely stated that the column for signatures opposite the 56 names was blank. The rule is less stringent where the evidence is negative than where the attempt is to reproduce orally the written language of an instrument, especially one that creates or disposes of rights. The tendency of modern decisions and text-books is to relax the rule, and not to apply it to instruments only collaterally involved in the case. Greenleaf on Evidence (16th Ed.) p. 169.

Hopkins' evidence that the names from No. 575 to No. 635 on the service time book were put in alphabetical order on the pay roll and the items were all $60 items, was testified to in effect by the defendant himself. The defendant testified that he and another transferred the names from the service book to the pay rolls, and the 60 names were shown to be on the service book. According to the course of business, all names appearing on the service book were transferred from it to the pay rolls alphabetically. The important questions were whether the names were written on the service book by the defendant, and whether the pay envelopes had been prepared for them and were missing. Four of the 60 pay envelopes, for which there were no corresponding employés, were still in the basket at the time the loss of the others was discovered. The course of business was such that pay envelopes were prepared for all names that appeared on the service time book, and the 56 names involved did so appear. The evidence clearly shows that the course of business was followed on this occasion. We conclude that there was no reversible error in the District Court's ruling on the assignment based on Hopkins' evidence.

[3] 2. The plaintiff in error complains that the United States at-

torney, in his argument to the jury, was permitted to characterize the defendant as a gambling Jew, against defendant's objection that—

"There was no evidence in the record as to what nationality or race the defendant belongs, and because the said reference and designation constituted a direct appeal to the prejudice and passion of the jury against the Jewish race."

The court admonished the United States attorney to confine himself to the record, but did nothing else. We are not concerned with the propriety of the comment. The ground of objection was solely that there was no evidence in the record of defendant's race. We think his original name and the circumstances of his change of name were some evidence of his race. His appearance, accent, and demeanor were before the District Court, and may have been physical evidence, tending to show his race, which the jury would have a right to consider.

[4] · 3. There was evidence tending to show that there was a shortage in the amount of the pay roll money, put up in envelopes, and that the defendant was accountable for it, and the District Judge could not have properly directed an acquittal.

Finding no error in the record, the judgment is affirmed.