## BEDELL v. UNITED STATES. *

## CHAPMAN v. SAME (two cases).

### Nos. 10192-10194.

Circuit Court of Appeals, Eighth Circuit.

June 6, 1935.

Rehearing Denied Aug. 5, 1935.

*Writ of certiorari denied 56 S. Ct. 152, 80 L. Ed. ——.

360

H. E. Narey, of Spirit Lake, Iowa, for appellant Walter B. Bedell.

Louis H. Salinger, of Carroll, Iowa (William P. Welch, of Logan, Iowa, and Eugene D. O'Sullivan, of Omaha, Neb., on the brief), for appellants L. E. Chapman and H. E. Chapman.

Marks Alexander, Sp. Asst. to U. S. Atty. (E. G. Moon, U. S. Atty., of Des Moines, Iowa, on the brief), for the United States.

Before GARDNER, SANBORN, and FARIS, Circuit Judges.

GARDNER, Circuit Judge.

These appeals are from judgments and sentences against appellants for a violation of section 135, Criminal Code (section 241, title 18 USCA).

The indictment against appellants, as originally returned, contained five counts, but three counts were quashed before trial, and the case proceeded to trial on the remaining counts 3 and 4.

Count 3 charges that the three appellants, together with William Stevenson and Gene Russell, during the trial of a criminal cause against several persons including William Stevenson and appellants Len and Hank Chapman, for conspiracy to violate the National Prohibition Act, and which was being tried in the District Court of the United States, for the Southern District of Iowa, Central Division, on the 15th day of March, 1933, "did then and there unlawfully, willfully, knowingly, and corruptly

endeavor to influence and impede Bert Gander," a petit juror in said cause, in the discharge of his duties as a juror, by offering him $200 if he would render a verdict in the cause in favor of the defendants therein, Len Chapman, Hank Chapman, William Stevenson, and George Day.

Count 4 charges that on the 16th day of March, 1933, the defendants "did then and there unlawfully, willfully and knowingly, corruptly endeavor to influence, obstruct and impede the due administration of justice in the said District Court of the United States for the Southern District of Iowa, in the trial of said cause, by then and there unlawfully, corruptly endeavoring to influence and impede said Bert Gander as such juror, as aforesaid, by means of giving, offering, and causing to be offered to said Bert Gander, a promise to give certain money, to-wit, $100.00," if he would vote not guilty as to the defendants Len Chapman and Hank Chapman.

Appellants each filed a demurrer and motion to quash on the ground, among others, that counts 3 and 4 alleged the same offense, and were bad for duplicity. It was asked that if the demurrer and motion to quash be overruled, the government be required "to elect on which count or counts in the indictment, and which sections of Title 18 USCA it intends and expects to rely." By amendment to the demurrer, each appellant also challenged the indictment on the ground that it failed to set forth facts sufficient to advise the accused of the charges which he had to meet, so as to give a fair opportunity to prepare his defense, and that the indictment was so vague and indefinite as to deprive him of his right under the Fifth Amendment to the Constitution of the United States in regard to double jeopardy, and of his right under the Sixth Amendment, to be informed of the nature of the accusation against him.

The court having overruled the demurrers and motions to quash as to counts 3 and 4, appellants filed a written motion for a bill of particulars to require the government to set out: (1) Which defendant personally made to the juror the offer charged to have been made; (2) if made by some one other than some of the defendants themselves, the name of the person or persons who did make it; (3) if in the presence of any of the defendants, which one of them; (4) whether the offer was oral or in writing; (5) if in writing, its words; (6) the place where the offer was made; and (7) the time of the day or night when the offer was made. This motion was also denied.

At the close of the government's case, and again at the close of all the evidence, motions for directed verdict were made by the appellants, and were overruled. At the close of the government's case, appellants interposed a motion that the government be required to elect between counts 3 and 4. The court held that the government should be required to elect which count of the indictment should be submitted to the jury, but held that the election need not be made until after the evidence was closed, and at the close of the evidence the government elected to stand on count 3.

On this appeal the following alleged errors are relied upon for reversal: (1) Error in overruling the demurrers and motions to quash; (2) error in denying the motion for bill of particulars; (3) error in not compelling the election when the government closed its case in chief; (4) misconduct of the United States District Attorney in making the opening statement; (5) error in receiving evidence; (6) error in overruling the motion for directed verdict because (a) an attempt could not be proved by proof of the completed offense, (b) the election to stand on count 3 bound the government to the date of March 15, 1933, and the acquittal on count 4 was an acquittal on both counts, and (c) the government did not prove that defendants knew Bert Gander was a juror; (7) error in instructing the jury; (8) insufficiency of the evidence; (9) the juror yielded to his own corrupt desires.

We shall consider these questions in the order named.

■ (1) It is the contention of appellants that counts 3 and 4 "charged one and the same offense, and it was an attempt by the Government to charge the defendants with the same offense in two separate counts of the indictment, and, as such, the indictment was bad for duplicity." We think the indictment was not subject to demurrer or motion to quash, at least on the grounds stated.

In Optner v. United States (C. C. A. 6) 13 F.(2d) 11, 12, the controlling rule is thus stated:

"Duplicity consists in joining in the same count two or more distinct and separate offenses. Misjoinder is the charging in separate counts, separate and distinct offenses arising out of wholly different

transactions having no connection or relation with each other. Where the facts stated in separate counts of an indictment are sufficient to charge an offense, the indictment is not vulnerable to a demurrer because of misjoinder. The government may enter a nolle prosequi as to counts improperly joined or it may be required to elect upon which counts it will proceed to trial."

This contention of appellants is without merit, and there was no error in overruling the demurrer and motion to quash.

(2) This court has consistently held that a motion for bill of particulars is addressed to the sound discretion of the trial court, and unless that discretion is clearly abused the ruling of the court thereon will not be reversed. Hartzell v. United States (C. C. A. 8) 72 F.(2d) 569. The most hypercritical reading of counts 3 and 4 of the indictment cannot create any doubt that defendants were definitely made aware of the charge against them, and no prejudice could have resulted from the overruling of this motion, and hence there was clearly no abuse of discretion. The proceedings during the trial gave no evidence that the denial of the motion prevented defendants from fully and adequately presenting their defenses.

(3) Appellant Bedell urges that he was prejudiced because the government was not compelled to make an election between counts 3 and 4 when it rested its case in chief. The prejudice he asserts was that he was thereby compelled to offer a defense on both counts. As the government elected to stand on count 3, and he was not required to go to the jury on count 4, he was not prejudiced as to count 4. As to count 3, he complains that the evidence in support of count 4 was considered as to count 3, on which he was convicted; but if the evidence was admissible, there was no legal prejudice, and if inadmissible, the question, if preserved by the record, may be considered on proper objections made to the admissibility of evidence, or in connection with the insufficiency of the evidence.

The granting or refusal to compel an election as to which of several counts the prosecution will proceed upon is usually within the sound discretion of the trial court. Pointer v. United States, 151 U. S. 396, 14 S. Ct. 410, 38 L. Ed. 208; Woodford v. United States (C. C. A. 8) 77 F. (2d) 861; Fain v. United States (C. C. A. 9) 265 F. 473. But inasmuch as an election was required, the only question is whether it was error to refuse to compel such election earlier than it was made. It is generally discretionary with the trial court at what state of the trial an election will be compelled. The question was recently considered by the Circuit Court of Appeals of the District of Columbia in Moffatt v. United States, 60 App. D. C. 35, 46 F.(2d) 616, where it is said:

"It is assigned as error that the court refused at the close of the government's case to require the government to elect whether it would go to the jury on the counts charging false pretenses or those charging larceny after trust. Inasmuch as the government at the close of all the evidence was required to make an election, and elected to go to the jury on the third and fourth counts only, this assignment of error is clearly without merit. Appellant was not prejudiced by the refusal of the court to require an earlier election, but it is quite conceivable that the government would have been."

We cannot say that the lower court abused its discretion in refusing to compel an earlier election.

(4) The Assistant United States District Attorney, in his opening statement to the jury, stated that after the jury in the conspiracy case had been dismissed for the day, Gander, the offending juror, was walking down the street in Des Moines, and was accosted by a stranger who had stepped out of a stairway, and asked him if his name was not Bert Gander. The attorney then continued: "I am not trying, gentlemen, to give you that actual conversation. It is better, I think, that you get that from the lips of the witnesses in this case. I will state, however, that in substance that man, who, by the way, will not be identified in this case by the evidence." Counsel for defendants then interposed the following objection:

"At this time the defendants object to that sort of statement by counsel for the Government, for the reason that it is plainly disclosed that it would be purely hearsay and not in any way binding on these defendants.

"The Court: Proceed, please. He has not said anything that he said. He has not said what this conversation was." (Defendants except.)

"Mr. Alexander: In substance the conversation was— .

"Mr. Welch: Now we object to any detailing of any conversation of this character as not competent in any opening statement, improper.

"The Court: Proceed. I cannot tell at this time whether it will be or not." (Defendants except.)

"Mr. Alexander: In order to avoid any difficulty about it, I won't state the conversation. I will state that he was accosted by a man. I did say that the evidence for the Government would not identify this man who accosted Bert Gander.

"The Court: Go ahead.

"Mr. Alexander: Until the court has opportunity to rule on it, I won't tell you what that conversation was. But I will state this, that Bert Gander proceeded to this home of a relative, and that as a result of having that conversation with this man whom he met on the street, that he then had a conversation with his nephew, who lived at the house where Bert Gander was going to stay, in which he—I will not go into that conversation."

This incident of the trial is so related to the alleged error in allowing the introduction of testimony as to the conversation between Gander and the unidentified man that the two may be considered together. Gander testified that the trial of the conspiracy case began Monday, March 13, 1933, and the jury was dismissed about 4 o'clock in the afternoon of that day. He went to the Northwestern Hotel with some of the jurymen, and stayed there in the lobby about an hour. At about a quarter of six, he started for his brother-in-law's home, where he was staying. On his way, he passed the Savery Hotel, and as he went by it a door or two, a man standing in the door of an unoccupied building stepped out and said, "Gander," twice. The witness halted and went to the stranger, who asked if his name was Gander, and was told that it was. The record shows objections to this as hearsay, and continues:

"The Court: You better leave out the conversation at this time. Just what he did after talking with him. It may be competent. I don't know, but not at this time.

"Mr. Alexander: I will ask other questions, Your Honor.

"Witness (continuing): I did not know this man. Had never seen him before. I am sure I saw him afterwards."

The witness testified that he had never been able to find out who this man was; that he talked with him about three minutes, and then went home. Over the objection that it was leading and suggestive, and called for the conclusion and opinion of the witness, and was incompetent, hearsay, and not binding on the defendants, and that no proper foundation had been laid, the witness was asked whether by reason of anything that this man who accosted him on the street said to him, he had any conversation with his nephew Gene Russell, who lived where the witness was staying. The objection was overruled, and the witness was asked separately to state what those conversations were. The same objection was interposed, and the following occurred:

"The Court: One of the defendants in this suit?

"Mr. Salinger: And the question is additionally objectionable as containing the assumption that the conversation with Russell was occasioned by the conversation with the unknown man.

"The Court: It is agreed that you are to connect this up? You are starting at one end.

"Mr. Alexander: I know it is difficult, Your Honor. I will avow that we will connect it up with Gene Russell.

"The Court: Well, go ahead." (Defendants except.)

"Mr. Alexander: I won't vouch for the other matter of this stranger. I cannot do that. But I will as to Gene Russell.

"Mr. Parsons: I make the further objection that this calls for a conversation with a party not on trial.

"The Court: Yes, we are not going to find out whether he is guilty.

"Mr. Parsons: This attorney here expressly stated was not on trial.

"The Court: All right. You can except. Go ahead."

Later, during the course of the trial, the court was requested to instruct the jury to disregard the testimony as to Gander's conversation with the unknown man, and the court, in response, said:

"I don't believe that any—What evidence he gave as to that I think I struck out. If there is any question about that as to the record at the present time, the members of the jury are instructed not to consider any statements that were made by the witness as to conversations had with this unidentified man—at the present time anyhow. If it becomes material we can go

364

over it again. As the record now shows I do not think that should be considered by the jury as evidence in the case, and they are now instructed that if there was any of that got in, that they should not consider it as against any of these defendants."

■ With this record so made, the claim of error in the opening statement or in admitting evidence as to any conversation with the unidentified man is far fetched. Appellants admit that the conversation was withdrawn, but assert that it was error to leave any part of the transaction remaining in the record. The substance of the evidence as to the transaction, omitting all reference to any statement made, is that on his way to his relative's home, Gander met an unknown man. This, we think, could not be prejudicial to appellants.

■ (5) It is urged that the conversations occurring between Gander and Russell, following the above incident, were erroneously admitted in evidence, and it is said they are hearsay because there is no proof of an agency at that time between Russell and any of the defendants. But they were admissible at least as introductory and preliminary to other transactions, to give the jury an intelligent understanding of the whole of the evidence, and as bearing on the relations of the parties. Facts whose existence is a necessary preliminary to the relevancy of evidence are properly received, and facts which tend to explain or unfold a situation are admissible as establishing the relevancy of evidence. The purpose of the testimony was not to establish the truth of these conversations, but that such conversation in fact occurred, and both Gander and Russell, the parties to the conversations, were produced as witnesses and testified to them, and they were subject to cross-examination by the defendants, and were actually cross-examined with reference thereto.

In Tolbert v. United States (C. C. A. 4) 11 F.(2d) 78, 79, a prohibition agent and one Conrad were convicted of conspiring to demand money for not informing against violators of the National Prohibition Act (27 USCA). The court permitted a witness to testify to a conversation between the prohibition agent and some third persons not in the presence of defendants. In the course of the opinion it is said:

"From what has already been said, the only important question of fact in controversy was as to whether the negroes and the Giberts were trying to bribe Tolbert not to do his duty, or whether he and Norris were seeking to extort money from them. Under these circumstances, we think it was quite within the discretion of the trial judge to permit the witnesses on each side so to tell their story, as to make clear the sequence of events as they knew of them."

In Hoback v. United States (C. C. A. 4) 296 F. 5, 9, in discussing the question of the admissibility of similar testimony, it is said:

"Often, as would have been true in the instant case, the exclusion of all such evidence would make it hard for the jury to understand just what had taken place, and would inevitably make them feel that something had been withheld from them, which they should know."

In Terry v. United States (C. C. A. 4) 51 F.(2d) 49, 52, the court, in considering the contention that a conversation between a witness and a third party was violative of the hearsay ruling, among other things said:

"That the conversation between Van Miller and Ramsey, objected to, is without the inhibition of the hearsay rule, defined above, is apparent. It was not offered as evidence of the truth of any fact asserted in the conversation. The truth of the statement of Ramsey that he had only one ounce left was not in issue in the case. * * * Hence, as the conversation related purely to a collateral matter and the truth or falsity of the statements or assertions in the conversation was wholly immaterial to the real issue in the case, and was in no way put in issue, it follows that the admission of the conversation did not violate the hearsay rule. * * *

"The conversation was not evidence of, but merely introductory to, the transactions which admittedly took place on the 18th and 22d, respectively, and did not tend in the slightest degree to implicate Terry in the illegal business."

The evidence, in the circumstances here disclosed, was introductory and preliminary, and was necessary to an intelligent consideration of what followed. It also reflected the frame of mind of the juror Gander, and his susceptibility to corruption, and it showed the initial act of the defendant Russell. Its admission could scarcely have prejudiced the defendants, as everything disclosed by this conversation was clearly established by other competent

evidence. It follows that there was no error in admitting this testimony.

█ Some time before the trial of the conspiracy case, there had been a charge in state court against Stevenson and Hank Chapman for carrying concealed weapons. Bedell, as their attorney, had arranged for each of them to plead guilty and pay a fine of $100. Over the objection that it was not material and not binding on the Chapmans, Stevenson, who was a witness for the government in the instant case, was allowed to testify that Len Chapman had refused to pay his brother Hank's fine, and wanted Stevenson to do so. The Chapmans then asked an instruction that this should be disregarded as against them. The court said:

"I don't know. If they were all working for a common purpose with reference to the trials, it would appear that the jury might find that they were together on this."

Counsel for defendants then said:

"This is another trial, if Your Honor please, and I respectfully except to the court's remark that there was any relevancy in their conduct in this charge in the state court to the case on trial.

"The Court: That is for the jury to determine." (Defendants except.)

In this case there was evidence of a concert of action between the defendants. In Hood v. United States (C. C. A. 8) 23 F.(2d) 472, 475, testimony was held admissible as to joint activities of the defendants preceding the date laid in the indictment. In the course of the opinion it is said:

"This evidence was competent for the purpose of showing the association of the defendants and their conduct of the same enterprise as bearing upon the existence of the conspiracy."

In Wallace v. United States (C. C. A. 7) 243 F. 300, 306, the court considered the objection of defendants to evidence offered by the government to the effect that prior to March 1, 1915, when the Harrison Drug Act (38 Stat. 785) went into effect, a co-defendant who pleaded guilty to a violation of that act had been convicted in the state courts of violating state laws against the sale of drugs; that he had then received the drugs from Wallace, the defendant on trial, and that Wallace assisted him in the matter of obtaining bail and in defending him against these charges. In holding the evidence competent, the court said:

"We think the evidence was competent as bearing on the relations between Wallace and Davis, and on their state of mind and motive in the handling of such drugs after March 1st."

The evidence here objected to tended to show the relations between these defendants, and it was properly received.

█ (6) It is urged that the court erred in denying defendants' motion for a directed verdict, and in this connection it is contended that because the evidence shows the endeavor to influence or impede the juror was successful, the conviction cannot stand. Authority is cited to the effect that an attempt is but part of a completed crime.

The statute (Section 135, Cr. Code, 18 USCA § 241) provides:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, shall endeavor to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or officer acting as such commissioner, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or officer acting as such commissioner, in the discharge of his duty, or who corruptly or by threats or force, or by any threatening letter or communication, shall influence, obstruct, or impede, * * * the due administration of justice therein, shall be fined not more than $1,000, or imprisoned not more than one year, or both."

This statute not only condemns influencing, obstructing, and impeding the due administration of justice, or endeavoring so to do, but it also condemns endeavoring to influence, intimidate, or impede a juror. Count 3 of the indictment charges that the defendants endeavored to influence and impede the juror Gander in the discharge of his duties as a juror. In United States v. Russell, 255 U. S. 138, 41 S. Ct. 260, 261, 65 L. Ed. 553, the Supreme Court, in considering this section, said:

"The section, however, is not directed at success in corrupting a juror, but at the 'endeavor' to do so. Experimental approaches to the corruption of a juror are the 'endeavor' of the section. Guilt is incurred by the trial—success may aggravate; it is not a condition of it."

Again, the court said:

"The word of the section is 'endeavor,' and by using it the section got rid of the technicalities which might be urged as besetting the word 'attempt,' and it describes any effort or essay to do or accomplish the evil purpose that the section was enacted to prevent."

It is observed that the success of the endeavor aggravates the offense, and hence it could not well destroy it. The lower court instructed that whether the offense was successful and completed was not a condition to successful prosecution, and this instruction was not excepted to.

Defendants urge that a verdict should have been directed for them because count 4 charges that on the 16th of March, 1933, they did unlawfully, willfully, and knowingly corruptly endeavor to influence, obstruct, and impede the due administration of justice in the District Court by then and there unlawfully, corruptly endeavoring to influence and impede Bert Gander as a juror by means of giving, offering, and causing to be offered to him $100 for voting "not guilty" as to the defendants Len Chapman and Hank Chapman. Count 3 charges that the defendants, on the 15th day of March, 1933, did unlawfully, willfully, knowingly, and corruptly endeavor to influence and impede Bert Gander as a petit juror in the discharge of his duties, by offering and causing to be offered to him the sum of $200, if he would render a verdict in favor of Len Chapman, Hank Chapman, William Stevenson, and George Day. The government having elected to proceed under count 3, the defendants moved for a directed verdict of acquittal on count 3 "because the disposition of Count 4, which includes all criminality within three years of the time charged therein and of its rendition, includes the point of time in the remaining count, and there having been a jeopardy thereon, there cannot now be a prosecution on the remaining count." The motion was denied. The court, in its instructions to the jury, said:

"It is not necessary to conviction that the alleged offense was committed on any precise date. It is sufficient if it is shown by the evidence to have been committed on or about the date charged in the indictment and prior to December 2, 1933, being the date when the indictment was returned."

Defendants excepted to the instruction "with respect to proof as to time for the reasons given in the motion."

Defendants contend that counts 3 and 4 charge identical offenses, except as to time, and hence, when count 4 was abandoned, it was equivalent to a verdict of not guilty, and therefore defendants had been in jeopardy of a conviction under the abandoned count for any offense committed on March 15, and hence they could not be tried under the remaining count charging an offense on that date. It is urged that the rule of former jeopardy required acquittal of the charge in count 3, but if not, that the court should have instructed that time was to be proved as alleged in count 3. We think counsel misconceives the effect of electing to proceed on count 3. The abandonment of count 4 was in effect a nolle as to that count, and as said by us in Cochran v. United States, 41 F.(2d) 193, 207:

"It should be observed that the dismissal as to this count was not tantamount to an acquittal on that count. As said by the Supreme Court of the United States in Dealy v. United States, 152 U. S. 539, 14 S. Ct. 680, 681, 38 L. Ed. 545: 'A nolle was entered as to several, but a nolle works no acquittal, and leaves the prosecution just as though no such count had ever been inserted in the indictment.'"

See, also, Dunn v. United States, 284 U. S. 390, 52 S. Ct. 189, 190, 76 L. Ed. 356, 80 A. L. R. 161; Selvester v. United States, 170 U. S. 262, 18 S. Ct. 580, 581, 42 L. Ed. 1029.

This contention of appellants is put to rest by what is said by the Supreme Court of the United States in Dunn v. United States, supra. In that case, the defendant was indicted under three counts. He was acquitted on the second and third counts, and found guilty on the first. It was contended that the verdict of acquittal on the second and third counts was inconsistent with the verdict of guilty on the first count, and that he was entitled to invoke the doctrine of res judicata. In disposing of this contention, the court said:

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. Latham v. The Queen, 5 Best & Smith, 635, 642, 643; Selvester v. United States, 170 U. S. 262, 18 S. Ct. 580, 42 L. Ed. 1029. If separate indictments had been presented

against the defendant for possession and for maintenance of a nuisance, and had been separately tried, *the same evidence being offered in support of each,* an acquittal on one could not be pleaded as res judicata of the other. *Where the offenses are separately charged in the counts of a single indictment the same rule must hold."* (Italics supplied.)

In Selvester v. United States, supra, the court considered a verdict finding the defendant guilty on the first, second, and third counts, and disagreeing as to the defendant's guilt on the fourth count. In the course of the opinion it is said:

"Whatever may be the present rule in Ohio, it is manifest from the foregoing brief analysis of the cases cited by the plaintiff in error to sustain the contentions upon which reliance is placed that they rest upon the theory that, even although the offenses charged in the several counts of an indictment be distinct and separate crimes, such a solidarity is created between them by charging them in several counts of one indictment as to render void any verdict which does not specifically and affirmatively respond to each and every count. But this proposition, whatever may be the support found for it in early cases, is not sound in reason, and is negatived by the decisions of this court and the opinion of text writers, that is to say, it is refuted by the conclusive weight of authority."

■ The rule of double jeopardy is based upon identity of offenses, and the plea of autrefois acquit is unavailing unless the offense sought to be interposed is precisely the same in law and in fact as the former one relied upon under the plea. Dunn v. United States, supra; Burton v. United States, 202 U. S. 344, 26 S. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 362; Curtis v. United States (C. C. A. 10) 67 F.(2d) 943.

■ Count 4 appears to have been drawn under that part of the statute which prohibits corruptly endeavoring to influence, obstruct, or impede the due administration of justice, while count 3 is drawn under that part of the statute which prohibits endeavoring to influence, intimidate, or impede a petit juror. But there are still further differences to be noted in the offenses charged. The charge of endeavoring to influence the juror on the 16th to vote not guilty as to two defendants, by offering him a bribe of $100, is clearly not the same offense as the charge of endeavor-

ing to impede the juror by offering him a bribe of $200 on the 15th to influence him to render a verdict in favor of four defendants. It cannot be consistently argued that if what is set out in count 4 had been proved under count 3, there could have been a conviction; but in any event, the offenses are not identical "in law and in fact."

■ On this branch of the case, it is finally argued that if the offenses charged in the indictment are distinct, then the evidence received in support of the charge in count 4 should not be considered as bearing upon their guilt or innocence of the crime charged in count 3. No request or motion was made to eliminate any of the evidence from consideration of the jury. The court submitted to the jury, without objection or exception, the question of whether defendants were acting through concert of action or with a common understanding. If, therefore, we should draw the line as strictly as defendants attempt to do between the dates the 15th of March and the 16th of March, still all the evidence of what transpired on the 16th was admissible to show the relationship, understanding, and common purpose, and the whole of the evidence was admissible under count 3.

In Bryan v. United States (C. C. A. 5) 133 F. 495, 499, four counts of an indictment charged uttering or having uttered, or having in possession counterfeit 5-cent pieces, and in another the defendant was charged with possessing molds for counterfeiting 25-cent pieces. The latter count was dismissed before the case was submitted to the jury, and the defendant requested the court to withdraw from the jury the molds introduced in evidence under the dismissed count, as well as the evidence relative thereto, as the same had become irrelevant and immaterial to the other issues joined on the remaining counts of the indictment. In reviewing the action of the trial court in refusing so to do, the Circuit Court of Appeals said:

"In reference to that count and the admission of this evidence, the counsel suggests that when the testimony was admitted it was in the nature of direct evidence introduced for the purpose of convicting plaintiff in error on the count No. 4 of the indictment. That may very well be one of the grounds on which this testimony was admitted at the time it was admitted, and it may be conceded that it was in the nature of direct evidence to support that

count of the indictment; but it by no means follows that, because it was in the nature of direct evidence to support one count in the indictment, it thereby had, or for any other reason shown in this record, lost its character as indirect evidence to illustrate the intent, and from which, with other circumstances, the jury could deduce the intent of the defendant in doing the acts otherwise fully established against him, charged in the counts Nos. 1, 2, and 3."

So, in the instant case, the evidence as a whole all related to the question of the guilt of appellants under count 3, and was proper for consideration by the jury.

■ It is next contended that there was no proof that the appellants knew Bert Gander was a juror. The court instructed the jury that one of the material allegations of the indictment which the government must establish beyond a reasonable doubt was "that on or about the 15th day of March, 1933, and during said trial, the defendants each knew that said Bert Gander was a member of said trial jury." The indictment, in describing the offense, refers to the defendants as "then and there well knowing said Bert Gander to be such juror as aforesaid." Neither the instructions of the court, nor the quoted allegation from the indictment, made knowledge of the name of the juror an ingredient of the offense. Certainly, it was not material whether his name be Bert Gander, John Doe, or Richard Roe. The statute contains no such refinement. The use of the name of the juror was for purpose of identifying him. Appellants contend that proof that they knew his name was essential to their guilt. According to the evidence of the government, defendants knew that the man they were attempting to corrupt was a juror, and the alleged fact that "the name Gander, the man Gander, either as a juror or as a person, is literally absent from the record," as charged in appellants' brief, is quite aside from any question at issue.

We conclude on this branch of the case that the court did not err in denying appellants' motion for a directed verdict of not guilty.

■ (7) The only error assigned to the instructions to the jury requiring consideration is the claim of defendant Hank Chapman that the court erred in refusing to charge on circumstantial evidence. At the conclusion of the charge, counsel for Hank Chapman asked "on his behalf that as to the evidence to his participation is circumstantial and not direct, that the jury be instructed in effect that as to the evidence which is circumstantial, it must exclude—must not merely be consistent with his guilt, but must exclude the possibility of his innocence." This necessitates a consideration of the evidence as it refers to the appellant Hank Chapman.

Gene Russell testified that on one occasion he went at night to the room of Len Chapman in the Savery Hotel to discuss the matter of bribing Gander; that this subject was discussed between him and Len Chapman; that Hank Chapman was paying no attention but was sitting on the bed. The room was approximately 8 x 10 feet, including the bathroom, which was 4 x 4 or 5 x 5 feet. The conversation was in a normal tone of voice. Hank Chapman was about five steps from them at the time. Len Chapman had requested that a Des Moines bootlegger vouch for Gene Russell, and one Phillips, a man of that craft, arrived and satisfied Len Chapman of the reliability of Russell. At noon the next day, Thursday the 16th, Russell saw Len Chapman in his room. Hank Chapman was also present, and concerning this meeting, Russell testified:

"I said it would cost $200.00 and I believe $100.00 for each one of the other defendants. Len then stated that bootlegging was bad and that that was a lot of money and said that some defendants there were not safe to hold out on."

There was further conversation as to how the money should be handled. $200 was the figure agreed upon. Len Chapman produced $199, and Hank Chapman added $1 to make $200, and he and Russell counted the money. The money was handed to Bedell, who was to give it to Russell if the jury disagreed.

From this direct testimony, it appears that Hank Chapman participated in the endeavor, and hence it cannot be said that as to him the evidence was wholly circumstantial. There were some circumstances to be considered, yet there was direct evidence tending to prove the guilt of Hank Chapman, and hence the refusal of the instruction requested was not error. Portman v. United States (C. C. A. 8) 34 F. (2d) 406.

■ (8) Len Chapman contends that the evidence was insufficient to show his guilt. He and Russell began planning to bribe Gander Tuesday night, March 14, and

seemed to have been occupied in the task until the court discharged the jury on account of the disagreement over the guilt of the two Chapmans on the following Saturday morning. The disagreement was caused by Gander voting to acquit the Chapmans. Gander received $100 for his services, and Russell $100 for his part. Without reviewing the details of the evidence, we are satisfied that it follows beyond any peradventure of doubt that through Russell, Len Chapman endeavored to and did corrupt the juror, and that there was no more active agency in the transaction than he.

Bedell also raises the question of the sufficiency of the evidence to implicate him. Much could have been said, and doubtless was said, to the jury in his behalf, but the verdict of the jury establishes the following facts: On the night of the 14th of March, 1933, Len Chapman reported to Bedell that Russell had proposed the bribing of Gander; that at 11:45 p. m. Bedell called Stevenson at his home at Boone, Iowa, where he spent the nights during the conspiracy trial, and early the next morning got in touch with him and told him to bring over $200; that Stevenson brought $175, which was supplemented so as to make the $200, and was turned over to Bedell to hold to await the event. There was evidence of various conversations which would charge him with guilty knowledge. One of these was a conversation with Russell, in which the latter told him that they were going to "pull out"; that he and his uncle were afraid; and that Bedell assured him for various reasons that there was nothing to fear. $200 was actually turned over to Russell by Len Chapman. Bedell and Hank Chapman left the hotel room, and in a few minutes Bedell returned and said, "Did you get fixed up Russ?" to which Russell replied, "O. K.," and then Bedell said, "Well, that was a fine job." This evidence, together with many surrounding facts and circumstances more or less incriminating, is sufficient to sustain Bedell's conviction.

(9) It is finally argued that because the juror Gander yielded to his own evil desires, and in fact solicited the defendants to pay him for a disagreement, appellants could not be guilty of an endeavor to corrupt or influence him. The doctrine of entrapment sought by analogy to be invoked has no application to the situation here presented. The act, whether successful or not, by any party. having the purpose of cor-

ruptly influencing a juror, is condemned. The statute does not make guilt dependent upon the degree of receptivity or susceptibility of the juror's mind, nor the degree to which he responds to corrupting influences. The purpose of the law is to preserve unsullied the integrity of judicial proceedings, and an endeavor to influence or corrupt is punished, regardless of the fortitude or moral laxity of the juror to be approached.

We conclude that the judgment and sentence appealed from should be affirmed, and it is so ordered.