## BARSHOP v. UNITED STATES.
### No. 13142.

United States Court of Appeals
Fifth Circuit.
Aug. 22, 1951.
Rehearing Denied Nov. 23, 1951.

288

---

Dan Moody, Austin, Tex., Bernard Ladon, San Antonio, Tex., for appellant.

Joel W. Westbrook, Asst. U. S. Atty., Henry W. Moursund, U. S. Atty., San Antonio, Tex., for appellee.

Before McCORD, RUSSELL and RIVES, Circuit Judges.

McCORD, Circuit Judge.

Joseph Jacob Barshop was indicted for a violation of Section 145(b) of 26 United States Code 1946. The indictment contained five counts and charged that by filing and causing to be filed false and fraudulent income tax returns for the years 1942, 1943 and 1944 he wilfully and knowingly attempted to defeat and evade a part of the income tax due by him for each of said years; and that by filing and causing to be filed false and fraudulent income tax returns for the years 1943 and 1944, he wilfully and knowingly attempted to defeat and evade a part of the income and victory taxes owed by his wife for the year 1943 and a part of the income tax owed by her for the year 1944.

The indictment was returned on April 4, 1948. The case was tried to a jury from January 2, 1949 through January 14, 1949. The jury found the defendant guilty on all five counts of the indictment. The record consists of two volumes and aggregates 1213 pages, and the briefs are voluminous.

Joseph Jacob Barshop was engaged in the wholesale and retail produce business with residence at San Antonio, Texas. He was sole owner of the Banana Distributing Company, of the Fruit Distributing Company and of a beer business, and was also engaged in importing pineapples in carload lots from Mexico. These pineapples were shipped to the border at Laredo, Texas and Nuevo Laredo, Mexico. When the cars arrived at the border loaded with pineapples, the defendant made payment therefor from different banks in Texas. The defendant had a brother-in-law who lived in Waco, Texas, and a large number of payments for pineapples were made by this brother-in-law through a bank there. It is without dispute that the defendant's income from pineapple profits mounted into thousands of dollars.

In January of 1946 agents for the Government commenced an investigation of the defendant's income tax returns. When the investigation began no information was given by the defendant touching his pineapple business. Moreover, the tax investigators were not informed of the different banks in which the defendant did business and kept accounts. It became necessary for the investigators for the Government to search out and ascertain the true facts touching nearly every phase of the defendant's business. The community net income of the defendant and his wife as determined by the net worth method exceeded that reported in the returns by $126,011.90 for 1942, $122,294.65 for 1943, and $113,393.08 for 1944. By the profit and loss method also the government proved that the net taxable income of the defendant and his wife for the tax years involved was far in excess of that reported in the returns.

It is without dispute that the defendant received large sums by way of profit from his pineapple business, other than that reflected on the books of the Banana Distributing Company, and no part of which was returned for tax purposes for the years involved, and that no tax was paid thereon. This profit from his pineapple business amounted to a little over $400,000. In addition to this amount, adjustments made by the Revenue Agent increasing defendant's taxable income for the years involved other than from his pineapple income amounted to $192,974.35.

It is further without dispute that defendant and his wife retained in their possession

substantial unreported income upon which no taxes were paid. Therefore, in deciding whether or not there was substantial evidence warranting the submission of the case to the jury for their determination, the only question to be determined is whether the defendant wilfully and knowingly attempted to evade taxes during the years here involved.

The defendant was the sole owner of the Banana Distributing Company and was a partner in the Mexican Banana Company. The Mexican Banana Company, we are impressed, reported its income accurately, which reports were prepared by other partners, but the returns of the Banana Distributing Company are replete with inaccuracies and errors, and fail to disclose and include profits from business transactions. One entry of the Banana Distributing Company shows that a check for $30,000 dated April 27, 1943, and signed by the defendant, was personally made by defendant and reflected the purpose for which the check was drawn as being "J. B. Exchange to buy pines in Mexico," whereas it was found that this amount represented a loan. Another entry in the records of the Banana Distributing Company shows a check for $20,000 dated April 26, 1943, signed by the defendant, whereon the corresponding stub, which was personally made by defendant, reflected the purpose for which the check was drawn as being "J. B. Exchange to buy pines in Mexico," when in fact, the amount of said check constituted a bank transfer of funds. Still another entry found in the records of the Banana Distributing Company and which entry was on the stub of a check for the amount of $10,-000, dated November 18, 1943 and signed by the defendant, showed the purpose for which the check was drawn as being "Purchases," when in truth and in fact, the undisputed evidence shows that the amount of this check was a loan to the Mexican Banana Company, which was repaid in 1945. The effect of each of these entries was to reduce the defendant's net income for tax purposes for the year involved by a like amount. A long line of checks was shown to defendant as he testified and when confronted with entries which were erroneous he would explain to the jury that the mistakes were made by his bookkeeper.

A number of checks were made payable to Benny Markusfeld, a brother-in-law of the defendant, and which totaled $94,999.70. These checks were drawn on an account called the Joe Barshop Pineapple Account in the Laredo National Bank during the years 1943 and 1944. One of these checks was in the sum of $10,000 and was deposited to the Benny Markusfeld account in the Frost National Bank, San Antonio, Texas, August 14, 1942. Two checks in the amounts of $7,855.45 and $7,144.55 were deposited to Markusfeld's account in the First National Bank of Waco, Texas on August 17, 1942, and another in the sum of $5,000 was deposited in the Waco Bank on August 20, 1942. These checks totaled exactly $30,000. On August 10, 1943, there was deposited to the account of Benny Markusfeld on the National Bank of Commerce, San Antonio, Texas, a check in the amount of $23,229.10. On August 16, 1943, there was deposited to his account in the Waco Bank a check in the sum of $19,101.07. Two checks payable to Markusfeld, one in the sum of $18,028.08 and the other in the sum of $4,641.45, each being endorsed by Benny Markusfeld and Joe Barshop, were deposited to the account of Mary Barshop in the National Bank of Commerce, San Antonio, Texas. In explaining these checks, the defendant first stated he had given these amounts to Mary Barshop. Later he stated the total amount of the two checks was the repayment of a $15,000 loan to Markusfeld and his wife's interest of approximately $7,000 in her mother's estate. These amounts appear nowhere on defendant's records or his tax returns, either as items of expense or income. They total $64,999.70 and were issued in 1943. The checks issued to Benny Markusfeld, the brother-in-law of the defendant, were, defendant testified, given in payment of services rendered. The defendant had previously stated to the Agent that Markusfeld had no interest in the pineapple transactions and that he would assume that he drew the money to pay one Isla, a Mexican broker, from whom defendant purchased pineapples.

In explanation of why he did not make returns to the Government on the substantial profits made from the pineapple transactions, the defendant testified that he did not think that he owed taxes on money made on the pineapples which he purchased through Isla in Mexico. The court permitted defendant to testify at length that he had heard many persons say to him while in Mexico that he did not owe taxes on pineapples purchased there. He gave the names, the time and places where he heard these persons make statements to him that he did not owe such taxes. Furthermore, he testified that he had never been informed or heard anyone mention that such taxes were exempt *only* to persons living without the United States. The defendant further testified that he never at any time inquired about his owing taxes on his pineapple earnings; that he did not consult an accountant, a lawyer, or anyone else as to whether he owed taxes on his income from pineapples purchased in Mexico, until the investigation was commenced in the year 1946 by government agents. At that time one of the government agents informed him that he was of opinion he owed taxes on profits made from the pineapple transactions and advised him to seek the advice of a lawyer or an accountant. The defendant thereupon employed an accountant to make up for him a statement of what he owed in the way of taxes and later, in company with his accountant, he interviewed a government agent and told him that he wanted to correct some testimony previously given. He then stated that Markusfeld had an interest in the profits derived from the importation of the pineapples; that Markusfeld was a sick man at the time he first talked to the agent; that he did not want to bother Markusfeld or have the agents bother him; and that he stated that Markusfeld had no interest in the income and that the defendant was willing to have it added to his account. During the interim between the defendant's two conversations with the agent, Markusfeld had died. When the defendant's attention was called to the two checks in the sum of $7,855.45 and $7,144.55 and which totaled $15,000,

and both had been deposited to the Markusfeld account on the same day and that they had cleared through the Laredo Bank on the same day and he was asked why the total amount was broken down in that manner, he stated, "To make it look good," or "To make it look better." The agent charged the defendant with this total of $94,999.70.

It becomes patent, from a careful reading of the record, that the defendant was reluctant and seemed unwilling to testify frankly and without evasion. A cursory reading of the record will readily disclose that government counsel were compelled to use continuous pressure to obtain from the defendant evidence approaching a frank and full statement of his business dealings. One may gain from his answers while testifying as a witness that he was not only evasive, but alert to parry an open disclosure of his business. Furthermore, he gave to the government investigators no information as to his business affairs save and except what they asked for, and then it was found in many instances the information which he gave was inaccurate and misleading. His money was deposited in several banks, as to which he gave no information. His substantial earnings from his pineapple business he did not even enter on his books. He left to the investigators the laborious task of searching out and finding where his funds were located and nearly all the facts upon which they could base an accurate return. In their investigation, they found that the defendant had purchased valuable property in San Antonio, Texas and when called upon to explain how much was expended for such property and its value he advised the investigators that the broker Isla, a wealthy citizen of Mexico, owned an interest in this property, or that it stood as security for money he owed this fruit broker. However, the title to the property was in the defendant.

After the return of the indictment against the defendant, and after he had employed an accountant, and after he had been advised that he owed taxes on his pineapple income, the *bona fides* of his failure to pay these taxes created a question

for the jury. He had made thousands of dollars from the pineapple business; he had not paid taxes on the money derived from this source and his only defense is that he had been advised by many persons in Mexico that he did not have to pay such taxes. He had entered into a contract with a Mexican citizen by the name of Isla and he testified that he owed Isla a large amount by way of brokerage fees. He never attempted to show that he was a citizen of Mexico, and the contract he had entered into for the purchase of pineapples in Mexico lifts above any fog of doubt that they were to be sold in the United States: "Tenth: As the pineapple contracted by the Company is dedicated solely and exclusively for sale as fresh fruit in the U. S. A., it is understood that under no condition will it be permitted to be sold, all or in part, in the Republic of Mexico." This contract informed the defendant since he was no citizen of Mexico that his earnings became an integral part of his income.

█ There was no error in refusing to give the requested charge of the defendant for a directed verdict in his behalf. There is no dispute that the defendant and his wife withheld substantial funds owing to the Government by way of income tax, and it was for the jury to say whether the defendant's conduct constituted a wilful attempt to defeat and evade income taxes. Stilson v. United States, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154; Gurinsky v. United States, 5 Cir., 259 F. 378; U. S. v. Skidmore, 7 Cir., 123 F.2d 604, certiorari denied 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1201; cf. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

Immediately after the defendant was indicted and before his trial, he mailed to the Government his check in the sum of $260,106.15. The Government did not introduce the check, but did prove, without objection, that the remittance had been received. The defendant then introduced a copy of the check. The defendant next offered in evidence a letter that accompanied the check and which, except for the letterhead and signature, is as follows:

"October 15, 1948

"Collector of Internal Revenue
"Austin, Texas
"Sir:
"I am attaching hereto the following:
"(1) Copy of the indictment returned by the Federal Grand Jury in the District Court of the United States for the Western District of Texas, San Antonio Division, on October 5, 1948.
"(2) Analysis of the income and victory taxes alleged to be owed to the United States of America under said indictment and interest at 6% on said deficiency in taxes computed to October 19, 1948.
"(3) My check in the sum of $260,106.15 to cover said alleged deficiency in taxes and interest to October 19, 1948.

"The income tax alleged to be due under the 'First Count' for the year 1942 has not been included in the attached check, because such tax was forgiven by Section 6 of the Current Payment Act of 1943, 26 U.S.C. § 1622 note.

"This indictment is the first notice I have had that I owed Taxes in the amounts therein enumerated and I am, therefore, glad to pay the amount alleged to be due.

"When my income tax returns for the years 1942, 1943 and 1944 were prepared and filed, I did not include as part of the taxable income certain commissions I earned on transactions in Mexico because I honestly and in good faith believed they were not taxable in the United States and I was so advised in Mexico. Subsequently I ascertained that I was wrong and should have paid taxes on such income. I would have paid such taxes before had the Government notified me of the amount.

"I repudiate any allegation that my income tax returns were false or fraudulent and further state that I did not intend, wilfully or otherwise, to defeat or evade in any manner any part of the income taxes due to the United States."

The Government objected to the letter being admitted in evidence on the basis that it was self-serving. The defendant contended that by going into the transaction, the Government had "opened the

door" and that defendant was entitled to have the letter that accompanied the remittance admitted in evidence. The Government's objection was sustained and the letter was excluded.

■ This is not a case where part of a conversation or document has been introduced by one party, and the other party is then entitled to introduce all of the conversation or document. The Government had merely proved as a fact that the remittance had been received which went to show that at the time of the indictment the defendant owed at least that amount in unpaid income taxes. It may be observed that later in the trial it appeared that that fact was without dispute. The letter could be admissible only upon the theory that it is a part of the *res gestae* of the remittance. "Res gestae must spring from the main fact; it presupposes a main fact and it means the circumstances, facts and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character. * * *" Yarbrough v. Prudential Ins. Co. of America, 5 Cir., 99 F.2d 874, 876.

■ The main fact "may, however, be either the ultimate fact to be proved or some fact evidentiary of that fact". 32 C.J.S., Evidence, § 405. Here the main fact was the remittance as evidence of the fact that the defendant owed at least that amount in unpaid income taxes. The letter did not deny that the amount of the remittance was justly owed. It was not necessary to explain the remittance. Its statements related rather to past acts and occurrences. It was carefully prepared and deliberately self-serving. There was no spontaneity nor impulsiveness about the letter. See Halleck v. Hartford Acc. & Indem. Co., 5 Cir., 75 F.2d 800. We conclude that it was not admissible in evidence as a part of the *res gestae* of the remittance. 32 C.J.S. Evidence, §§ 416 and 417. Yarbrough v. Prudential Ins. Co., 5 Cir., 99 F.2d 874, rehearing denied 5 Cir., 100 F.2d 547.

■ Furthermore, the defendant was not injured by the exclusion of this letter, because the trial court permitted him to testify to the same facts as contained therein.

■ Wilfulness was of course an essential element of the case to be proved, and the defendant insists that the evidence to prove wilfulness was circumstantial and that the court erred in refusing to instruct the jury on the law of circumstantial evidence. In nearly all cases intent must be inferred from the facts and circumstances of the case. The trial court charged the jury fully and carefully that honest mistake or good faith belief on the part of the defendant were complete defenses. He further charged the jury in effect that unless they disbelieved these defenses beyond a reasonable doubt and were satisfied beyond a reasonable doubt that the defendant wilfully and knowingly attempted to defeat and evade his income taxes, that they should find him not guilty. Other than included in these defenses of honest mistake and good faith belief, there was no hypothesis which the jury might reasonably have considered to explain the evidence on a basis of innocence rather than on a basis of guilt. The jury's verdict concludes the question that neither of these defenses was reasonable in the minds of the jurors. We cannot conceive how the jury could have disbelieved these defenses beyond a reasonable doubt and could still have believed that a reasonable hypothesis of innocence existed or that the proof was consistent with innocence. The court carefully and patiently charged the jury in language which the trial judge thought would be most helpful to the jury and which protected every substantial right of the defendant. The defendant was not entitled to have the court charge the jury in language selected by the defendant rather than by the court. See Onderdonk v. U. S., 5 Cir., 16 F.2d 116.

■ Moreover, the record is replete with contradictory statements in the defendant's answers which were in nowise circumstantial. The conduct of the defendant, his seeming unwillingness to answer fully the questions propounded to him and his attempt to explain all the discrepancies by placing the responsibility for

them on his bookkeeper, justify the jury's finding as to fraud. It is well established that where both direct and circumstantial evidence supports a conviction, failure to give a circumstantial evidence charge does not constitute reversible error. See Bedell v. U. S., 8 Cir., 78 F.2d 358; Portman v. U. S., 8 Cir., 34 F.2d 406.

The appellant urges that the trial court erred in permitting the Government to introduce evidence that Benny Markusfeld, the appellant's brother-in-law, failed to include the approximate $95,000, which has been heretofore referred to as having been paid by the appellant to Markusfeld in his (Markusfeld's) income tax return. As we have heretofore pointed out, the defendant had first claimed that Markusfeld had no interest in the pineapple earnings, and had later, after Markusfeld's death, reversed that position. The defendant himself had brought out in the evidence that the Government was charging this sum of $95,000 as income to Markusfeld's estate for the year 1943 and was attempting to collect that sum from the Markusfeld estate. In rebuttal of that evidence, and as an inference that the possession of this $95,000 was not in his (Markusfeld's) own right but was actually in aid of the defendant's attempt to evade his own income taxes, we think that it was competent for the Government to prove that Markusfeld had not reported this $95,000 as income.

The appellant strenuously urges that the trial court deprived him of his privilege against self-incrimination as guaranteed by the Fifth Amendment to the Constitution of the United States in that the trial court refused to admit the testimony of the witness Dan Dreeben to the effect that the defendant had stated to him that his pineapple income was not taxable until after the defendant took the witness stand and testified to his good faith belief that such income was not taxable. The appellant insists that that action of the court compelled the defendant to take the witness stand involuntarily and under compulsion. At the time the court made the statement that Dan Dreeben's testimony would be admitted after the defendant had taken the witness stand, the defendant's counsel had already informed the court that the defendant expected to testify as a witness. At no time during the trial was the court advised that his ruling with respect to Dreeben's testimony was going to force the defendant to take the witness stand. We conclude from the evidence that as a matter of fact the defendant took the witness stand voluntarily, in accordance with his intention previously announced by counsel, and not because of the ruling of the court with respect to the testimony of Dan Dreeben. Whether the court properly declined to admit that testimony when Dan Dreeben was first offered as a witness it is not necessary for us to decide.

The charge of the trial court, viewed fully and fairly in its entirety, carefully protected defendant's every constitutional right, and substantially preserved for the consideration of the jury every important and material issue in the case. Furthermore, a careful reading and study of this voluminous record leads to the conclusion that the court exercised a patience and care throughout the trial which gave to the defendant every opportunity to show, if he could, that he was innocent, and the record looms above impatience and prejudice. Manifestly, a jury issue was presented, and the conviction and sentence must therefore be sustained.

We consider it unnecessary to pass upon the other specifications of error urged, as a careful consideration of each of them impels the conclusion that they are, without exception, wholly without substance or merit.

We find no reversible error in the record and the judgment is accordingly affirmed.

RUSSELL, Circuit Judge, concurring specially.

I concur in the judgment of affirmance. However, I am of the opinion that the ruling of the Court that the letter, which accompanied the remittance in payment of the amount of taxes which the indictment alleged the defendant had failed to pay, was inadmissible was erroneous. Nevertheless, under the circumstances of this case, and especially because the defendant

was permitted to testify to substantially the same facts as were stated in the letter which was rejected, I do not find that the error prejudiced the defendant.