Avelardo Felix SANCHEZ, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16533.

United States Court of Appeals
Eighth Circuit.

July 21, 1961.

Robert E. Brauer, St. Louis, Mo., for appellant.

William S. Fallon, Asst. U. S. Atty., St. Paul, Minn., for appellee. Clifford Janes, U. S. Atty., St. Paul, Minn., was with William S. Fallon, St. Paul, Minn., on the brief.

Before GARDNER, VOGEL and VAN OOSTERHOUT, Circuit Judges.

VOGEL, Circuit Judge.

This is an appeal from a judgment convicting the appellant, Avelardo Felix Sanchez, of the crimes charged against him in a three-count indictment. The three counts all arise from the alleged transfer of 30.6 grams of marihuana by the appellant to one Alfonso Orozco on January 11, 1960. Count 1 charged the appellant with unlawfully transferring the marihuana to Orozco in violation of 26 U.S.C.A. § 4742. Count 2 charged that the appellant, being the transferee of the marihuana required to pay the special tax imposed by 26 U.S.C.A. § 4741, obtained and acquired the marihuana without having paid the tax, in violation of 26 U.S. C.A. § 4744. Count 3 charged that the appellant unlawfully received, concealed, bought, sold and facilitated the transportation, concealment and sale of the marihuana after it had been imported and brought into the United States contrary to law, the appellant knowing it to have been so imported in violation of 21 U.S. C.A. § 174. Following a verdict of guilty on all counts, the appellant was, on May 23, 1960, given a general sentence on all counts of ten years' imprisonment. The appellant, having been previously convicted of an illegal transfer of marihuana eleven years prior thereto, was subject to a mandatory minimum sentence of ten years. 26 U.S.C.A. § 7237.

The evidence offered by the government in support of its charges against the appellant may be summarized as follows: On Sunday evening, January 10, 1960, Alfonso Orozco was arrested by Minneapolis police for having sold a quantity of marihuana on that same evening to Joanne Mims. Federal Narcotics Agent George Payne accompanied the Minneapolis police officers. He talked with Orozco. The latter agreed to cooperate with the federal government in securing evidence against his, Orozco's, source of supply. He was told by Payne that no promises could be made to him but that his cooperation would be made a matter of record and presented to the authorities, that it might make it easier for him, and that it would be up to the judge as to what the outcome would be. Orozco named the appellant as his source. He was then confined in the Minneapolis City Jail.

On the morning of January 11, 1960, Agents Payne and William D. Sineath secured Orozco's release from jail and with him drove to a point near Orozco's residence at 1701 Olson Highway, intending to take him to his apartment so that he could change his clothes and then go to his place of employment at the Music City Record Shop, 7th and Hennepin Avenue, Minneapolis. As they approached Orozco's apartment, they observed a 1950 Oldsmobile parked in front. Orozco identified the appellant as being one of the two occupants. The Narcotics Agents parked some distance behind the Oldsmobile. Orozco was instructed to approach the Oldsmobile and make arrangements with the appellant for the purchase of some marihuana. The transfer was to be made later in the day at the record shop where Orozco worked. Later that forenoon appellant did arrive at the record shop and he and Orozco entered a booth together, where the alleged transfer of marihuana took place. A signal that the transfer had been completed was given by Orozco. The Agents failed at that time to respond by making the ar-

rest. Shortly after giving the signal Orozco left the booth and entered a work room in the rear of the record shop where he allegedly deposited a brown paper bag containing the marihuana which it is charged was transferred to him by the appellant while they were in the booth. Thereafter Orozco returned to the record booth where the appellant had remained and where he was arrested by Agents Payne and Sineath. A brown paper bag from the work room was found to have contained what ultimately was analyzed by a United States chemist as marihuana. The government's side of this story was adduced through Narcotics Agent George Payne, through Alfonso Orozco and to a lesser degree through Narcotics Agent William D. Sineath.

The appellant testified in his own behalf. He was 30 years old and had known the informer, Alfonso Arozco, approximately a month and a half to two months. He first met him through purchasing records from him at the Music City Record Shop. He purchased quite a few records from him. They both liked Latin music. They became friends. They went out together. Orozco tried to interest the appellant in marihuana. Appellant, however, disclaimed any interest in narcotics and denied ever selling marihuana to Orozco, saying that he "was convicted once about it on narcotics, which was twelve years ago," that he had "had it" and didn't want anything more to do with it.

Appellant's story and explanation of what transpired on January 11th is to the effect that he and one Rodney Nelson were driving around Monday morning, January 11th, looking for work. They called at a number of different places without finding employment. They ended up in Minneapolis with no money and almost out of gasoline. Appellant suggested that they go to Orozco's home because Orozco owed him money. (This was substantiated by Orozco, who admitted that he owed the appellant "about $50 or so".) Appellant and Nelson went to Orozco's apartment residence. Appellant made inquiry upstairs and found out that

Orozco was not home. He and Nelson decided to wait for Orozco in the car because they were "stuck", having no money and no gasoline. While they were waiting Orozco appeared. Appellant asked Orozco if he could have a couple of dollars of the $20 that the latter owed him. Appellant said Orozco assured him that he could. Orozco then left and returned with the $20 he owed the appellant and also with $30 additional which Orozco was willing to let the appellant have to tide him over the week-end. They had further conversation about a record, but appellant denied that there was any talk about marihuana. Appellant admitted appearing later at the record store and going into a record booth but claimed it was only to hear and to pick up the record he and Orozco had discussed. Appellant denied that he transferred any marihuana to Orozco during his visit to the record shop or during the time he was in the record booth with Orozco.

It is the appellant's first contention that the trial court erred in permitting Narcotics Agent George E. Payne to testify, over appellant's objections, to conversations he had with Alfonso Orozco for the reason that the conversations were hearsay, prejudicial to the appellant, and not admissible for any purpose.

Because the government, on this appeal, takes the position that there was not sufficient objection to the obviously hearsay testimony, that in any event it was "merely cumulative of Orozco's later testimony", and that "conversations which are 'introductory and preliminary to other transactions to give the jury an intelligent understanding of the whole of the evidence' are admissible", we feel it necessary to set forth that portion of the direct examination of Agent Payne which follows:

(Payne has been testifying as to their approaching the Orozco apartment and seeing, and Orozco's identifying, appellant there in a car.)

"Q. And what happened after that? A. We had a conversation

with Orozco. Following that, Orozco approached the car.

"Q. What did Orozco say?

"Mr. Zelle: Pardon me. Your Honor, we object to this as constituting hearsay unless it can be shown that it is properly admissible.

"Mr. Fallon: The purpose of this testimony is to show subsequent activities of both the witness and Orozco.

"The Court: And for that purpose only?

"Mr. Fallon: For that purpose only. It is not introduced to prove the truth of the matter it states.

"The Court: You may answer, Mr. Witness.

"The Witness: I held a conversation with Orozco and asked him who was in the vehicle, and he stated that the defendant, Sanchez, was in the car, and he had seen the car previously, previous to this day. I told him to approach the vehicle and engage Sanchez in conversation.

\*    \*    \*    \*    \*    \*

"By Mr. Fallon:

"Q. What conversation did you have with Orozco before he left the car, before he left your car? A. I told him—

"Mr. Zelle: Pardon me one moment. I believe this is now repetitive, your Honor. I think we have gone into that conversation.

"The Court: You may answer.

"The Witness: I intructed him to approach the car where Sanchez was parked and engage him in conversation concerning a purchase of marijuana.

"By Mr. Fallon:

"Q. Did you give him any other instructions? A. I instructed him to suggest that the delivery be made at the Music City Record Shop later in the day.

\*    \*    \*    \*    \*    \*

"Q. You could not hear, I take it, then, anything that was said. Is that right? A. No, sir, I could not.

\*    \*    \*    \*    \*    \*

"Q. And did you subsequently see him or talk to him? A. Yes, sir. I proceeded back to the Government vehicle in which Agent Sineath was parked, and drove one block away where I met with Orozco again.

"Q. And did he get into the car? A. Yes, sir, he did.

"Q. And did you have any conversation with him that time? A. Yes, sir, I did.

"Q. What was that? A. I asked him what he had learned from Sanchez.

"Mr. Zelle: Your Honor, we will object to any further testimony as to what Orozco told Mr. Payne as to what Mr. Sanchez had told him on the grounds that this would be hearsay.

"Mr. Fallon: Again, your Honor, this is offered to prove the subsequent activities that took place.

"The Court: It may be received for that limited purpose. You may go ahead, Mr. Witness.

"The Witness: Orozco stated to me that he had had a conversation with Sanchez and that Sanchez had asked him for the money he owed him, and I asked him how much money this was. He said $50.

"By Mr. Fallon:

"Q. Did you understand this was money that Orozco owed Sanchez? A. Yes, sir. I asked Orozco why he owed Sanchez the money.

"Q. Did Orozco—did you give Orozco any instructions thereafter as to what he was to do? A. Yes, sir. I instructed him to obtain the money, which he did, and return to the automobile. He obtained the money by going into his in-law's place of residence which was just a few feet from where we were parked, and obtaining a sum of money and

returning again to the automobile where Agent Sineath and I were parked.

\* \* \* \* \* \*

"Q. And what did he do? A. I instructed him to return to the automobile where Sanchez was parked and order a quantity of marijuana from Sanchez to be delivered later in the day.

\* \* \* \* \* \*

"Q. What happened after you— where did you go when you went in there? A. I went into his apartment. The door was open.

"Q. Was there anyone else there other than Orozco? A. No, sir.

"Q. What happened there in the apartment? A. Orozco took a shower and I talked to him during the time he was showering and cleaning up, and I asked him what took place at the time he talked with Sanchez at the automobile.

"Q. Did he tell you what took place? A. Yes, sir, he did.

"Q. What did he say?

"Mr. Zelle: Your Honor, we will object to this as constituting hearsay, and also we feel that sufficient foundation has been laid now for subsequent events so that the subject matter of this conversation is not necessary for that purpose or for any purpose.

"The Court: Is this all going to unfold later on?

"Mr. Fallon: Your Honor, as I stated before, this is offered solely for the purpose of explaining the subsequent activities.

"The Court: I suppose it will be explained later if he reports what actually transpired in the music store somewhere, won't it, really?

"Mr. Fallon: As I said—

"The Court: I think it's unobjectionable the way you have got it. I am afraid he will say something that is objectionable.

"Mr. Fallon: Perhaps I can rephrase the question. I withdraw the last question.

"By Mr. Fallon:

"Q. Did he tell you that Sanchez had said that he would come to the record store? A. Yes, sir. He did.

"Q. And did he say that Sanchez would bring with him a quantity of marijuana? A. Yes, sir. He did.

"Q. Did he say at what time Sanchez said that he would come to the record store? A. Yes, sir.

\* \* \* \* \* \*

"Q. And what happened after you arrived there? A. We entered, Agent Sineath, Orozco and myself entered the record shop and instructed Orozco to await the arrival of Sanchez.

"Q. Did you give him any instructions with reference to what he was to do when Sanchez arrived? A. Yes, sir. We did.

"Q. What were those instructions? A. We instructed Orozco to await the arrival of Sanchez; at the time he arrived, enter a record booth with Sanchez and as the transfer of marijuana was made to withdraw a handkerchief from his pocket and blow his nose."

First, the government contends that of the answers assigned as being erroneously received

" \* \* \* only two were objected to as calling for hearsay and those two related only to Orozco's telling Payne that appellant was in the Oldsmobile and that appellant had asked Orozco for $50.00 owed by Orozco to appellant. All the other testimony of Payne as to his conversation with Orozco was received without objection except in one instance where the objection was that the testimony was repetitious."

From the foregoing portions of the transcript, however, we think the appellant's counsel made it perfectly clear to the

court and to government counsel that he was objecting to all the conversations on the grounds that they violated the hearsay rule. Having made his objection clear and having been overruled by the court, it was not necessary for him to repeat the hearsay objection, although he did so at one other point in the interrogation. In Union Electric Light & Power Co. v. Snyder Estate Co., 8 Cir., 1933, 65 F.2d 297. Judge Gardner speaking for this court said at page 303:

> "No specific objection was made to this last question, but an objection once made to a question preserves the objection to similar questions without the necessity of repetition, * * *."

Again, this court in Salt Lake City v. Smith, 8 Cir., 1900, 104 F. 457, stated at page 470:

> " * * * But the single objection which they made, and the single exception which they took, presented the entire question of the introduction of this hearsay testimony, and elicited a ruling of the court upon it which was conclusive and controlling at that trial of this case. There was no reason or call for further objections to evidence of this character, and their only effect would have been to annoy the court and to delay the trial. When a question has once been fairly presented to the trial court, argued, and decided, and an exception to the ruling has been recorded, it is neither desirable nor seemly for counsel to continually repeat their objections to the same class of testimony * * *."

See, also, 1 Wigmore, Evidence § 18 p. 331 (3d ed. 1940).

■ Next, the government would excuse the hearsay on the ground that it was

> " * * * merely cumulative of Orozco's later testimony. Being thus cumulative, even if improperly admitted, such error is not prejudicial, there being other competent evidence of the same facts. (Citing cases.) Further, the substance of Payne's testimony received over appellant's hearsay objection was later testified to by appellant himself."

It is true that Orozco did testify subsequently as to his conversations with the appellant and such testimony was, of course, admissible. But the government refused to vouch for the credibility of Orozco. The government's attorney in arguing to the jury said:

> " * * * We don't vouch for Orozco. This is a method of law enforcement. You take informants when you can get them. You try to catch these people as best you can within the limits of the law.
>
> "Now, Orozco was caught redhanded. He knew what he was facing, so he agreed to cooperate."

In arguing to the jury government counsel also stated that with his first two witnesses, that is, Payne and a government chemist, "the Government had proved its case", thus making it perfectly clear that he placed no reliance on or faith in the testimony of Orozco and did not need it to prove his case. The government now argues that the receipt of the hearsay testimony should be excused because the testimony was corroborated by Orozco, but in so doing it overlooks the fact that the jury was unequivocally told by the United States Attorney that Orozco was unreliable, that he wouldn't vouch for him. If we exclude the unreliable Orozco, then the jury had only the hearsay statements of Agent Payne with reference to the particularly damning conversations regarding the purchase of marihuana and the plans for its payment and transfer. Cf., Culwell v. United States, 5 Cir., 1952, 194 F.2d 808.

The government's added argument that the substance of Payne's hearsay testimony was later testified to by the appellant himself completely disregards the fact that while the appellant admitted having a conversation with Orozco, he

expressly denied that he and Orozco discussed marihuana and that they made arrangements for a transfer of it. His story of their conversation and their plans, including the date at the record shop, was entirely different from that given in Payne's hearsay testimony.

The government also contends that the testimony of Payne falls within the rule enunciated by this court in Bedell v. United States, 8 Cir., 1935, 78 F.2d 358, rehearing denied August 5, 1935, certiorari denied 296 U.S. 628, 56 S.Ct. 151, 80 L.Ed. 447. Therein Judge Gardner stated, 78 F.2d at page 364:

"* * * Facts whose existence is a necessary preliminary to the relevancy of evidence are properly received, and facts which tend to explain or unfold a situation are admissible as establishing the relevancy of evidence. The purpose of the testimony was not to establish the truth of these conversations, but that such conversation in fact occurred * * *."

At page 365:

"The evidence here objected to tended to show the relations between these defendants, and it was properly received."

That is not the situation in the instant case. Here government counsel claimed that the testimony was offered "to show subsequent activities of both the witness and Orozco". In spite of protestations to the contrary, it seems clear here that the government was not merely trying to show the fact of a conversation having been had, which would have been permissible, but wanted to and did introduce the substance of the conversation, including damaging statements with reference to the arrangements for the purchase and delivery of marihuana. Additionally, no question of the "relevancy of evidence" had been raised. The limited purpose for which the government ostensibly offered the objected-to hearsay testimony failed to justify the receipt of the substance thereof. Furthermore, it should be noted that while the court

stated that it was receiving the testimony for the limited purpose offered by the government, it failed to so instruct the jury, although specifically requested so to do at the conference preceding the giving of the final charge. The only related cautionary instruction given to the jury was as follows:

"You will recall that the Court permitted the Government to question the witness Joanne Mims *and the others* with reference to statements made to her and to them by a third person concerning the defendant. You are instructed that all of said evidence is to be considered by you only insofar as it relates to the weight you give to such testimony *and is not to be considered by you as evidence as to the defendant's guilt or innocence*." (Emphasis supplied.)

The effect of this instruction was to leave to the jury the arduous, if not impossible task of disentangling Agent Payne's hearsay testimony from his other testimony and from that of "others". The jury was then to determine only the "weight" to be given such testimony. This is not sufficient. See United States v. Block, 2 Cir., 1937, 88 F.2d 618, 620, certiorari denied 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed. 1347.

It is not the function of this, as an appellate court, to pass upon the guilt or innocence of the appellant. Whether we think Sanchez to be guilty or not is completely immaterial. What we are concerned with is whether errors have been committed which could be said to have substantially influenced or tended to influence the jury in arriving at its determination. This is not a one-sided case where the government has established the guilt of a defendant by overwhelming odds. Here the turn rests upon the credibility of Sanchez and Orozco. The jury could have believed, as suggested by other witnesses, that Orozco "put the finger on" Sanchez in order to protect his real source—a large dealer in narcotics. Sanchez's lack of money, the fact that

his family was on relief and his receiving unemployment compensation tend to add some credence to that view. Under the circumstances here we think it entirely likely that the jury was influenced by the erroneously-received hearsay testimony of Payne and that it was not healed by the unvouched-for statements of the informer, Orozco, who admittedly was attempting to curry favor with the government with a view of having his own pending case, wherein he had been "caught red-handed", "made easier for him". The guiding rules for the consideration of error were set forth by Mr. Justice Rutledge in his much-quoted opinion in Kotteakos v. United States, 1946, 328 U.S. 750, at page 764, 66 S.Ct. 1239, at page 1247, 90 L.Ed. 1557:

> "* * * And the question is, not were they [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. Cf. United States v. Socony-Vacuum Oil Co., supra, [310 U.S. 150], at [pages] 239, 242, [60 S.Ct. 811, at pages 851, 853, 84 L.Ed. 1129]; Bollenbach v. United States, supra, [326 U.S. 607, at page] 614, [66 S.Ct. 402, 406, 90 L.Ed. 350].

> "This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. *This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.*

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. Bruno v. United States, supra, [308 U.S. 287] at [page] 294 [60 S.Ct. 198, at page 200, 84 L.Ed. 257]. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. *The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.* It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." (Emphasis supplied.)

Applying the rules so well stated, we are not left with the conviction that the error did not influence the jury or that it had but slight effect.

■ An additional reason appears which forces the conclusion that the defendant did not have a fair trial. There were received over objection, as being prejudicial, Government's Exhibits Nos. 2 and 3 and such exhibits were allowed to be taken to the jury room during the jury's deliberations. The exhibits are brown Treasury Department, Bureau of Narcotics, evidence envelopes or jacket-type envelopes containing suspected marihuana, brown paper wrappers, rubber bands, smaller envelopes, etc. On the outside of the envelopes were printed and handwritten legends which were, in effect, condensations of the government's case against the appellant. Each was admitted over objections:

> "Mr. Zelle: Your Honor, I am wondering if it is necessary, the identification envelopes also be admitted into evidence, *there are certain statements on here which are objectionable.*

"Mr. Fallon: If the Court care to examine this?

"The Court: It seems all right to me. It may be received. Do you want to voice some more objections?

"Mr. Zelle: No. We do object to its admission.

"The Court: Objection of foundation or prejudicial material or something?

"Mr. Zelle: *Objection of prejudicial material on the outside of the envelope.*

"The Court: *It looks like a summary of what this man said here, little note is all it looks like to me.*

"Mr. Zelle: *There are statements there as to purchaser, receiver, or where it happened, and so forth, and we feel these are questions of fact.*

"The Court: *That is the viewpoint of the agents, that they purchased it, and from whom they purchased it. The jury doesn't need to believe them if they don't want to.*" (Emphasis supplied.)

On Exhibit No. 2 appear the following entries or legend: (The underscored portions are printed on the envelope; the portions not underscored are in handwriting.)

"Jan 12 1960 12735
12736
12737 12738

12 Jan '60
Tues JK

Treasury Department

Bureau of Narcotics

District No. 12     Case No. Minn-B1-M

Name Avelardo
     Felix Sanchez     Alias Lalu

Address 210 E. Indiana
          St. Paul, Minnesota

Evidence 30.6 grams of suspected marihuana contained in 4 brown paper wrappers w/ rubber bands and contained in brown paper bag

How Obtained (Purchased by Alfonso Or- (Found by
ozco

Where obtained Music City
          7th & Hennepin, Mpls., Minn.

Date 1/11/60          Time 11:55 A.M.

Amount paid, $

Witnesses: William O. Sineath

Krueger, Tolkinen and Fitzgerald
Minneapolis Morals Squad

Agent reporting case George E. Payne

Remarks: Evidence weighed and sealed on 1-12-60 by Payne in presence of Sineath and delivered along with original containers to U. S. Chemist on same date by Payne.

Form 149-Evidence Envelope (Rev. January 1936)

          No. 4-60-Crim. 17"

Exhibit No. 3 is similar, does not contain all the information written on Exhibit No. 2, but does have a complete report of the chemical analysis of the contents of the brown paper bag and the conclusion "marihuana identified in each sample in white envelope".

The government claims that the exhibits

"* * * do not summarize the Government's case. They in no way relate to the real issue involved, whether Orozco and the other Government witnesses were to be believed, *and in fact do not even refer to Orozco.*" (Emphasis supplied.)

The latter portion of the government's statement is, of course, patently erroneous. Exhibit No. 2 clearly refers to Alfonso Orozco as the purchaser. Furthermore, we think the exhibits do relate to the real issue involved. They, in fact, summarize in capsule form the government's case against the appellant. They present in officially impressive manner the name of the defendant, the alias by which he is known, they describe the evidence, recite the fact that it was pur-

chased by Alfonso Orozco, give the place, the time, the witnesses and the remarks.

Arguing that if it were error to admit the exhibits with the objected-to writings, it was harmless error, the government additionally claims that there was no objection or ruling made later when the trial court directed that "The exhibits which have been introduced in evidence here will go with you to the jury room." Under the circumstances, no additional objection was necessary. Appellant's counsel clearly and several times made it plain that he was objecting to the legends on the outside of the envelopes. He had no objection to the exhibits themselves. The situation is like that presented in United States v. Ware, 7 Cir., 1957, 247 F.2d 698, excepting there the defendant did make an additional objection when the exhibits were about to be taken to the jury room. As stated, we think the second objection unnecessary and accordingly that case is not distinguishable on that ground. Therein it was contended that the trial court erred in permitting the government to introduce in evidence exhibits prepared by Federal Narcotics Agents who on two occasions made purchases of heroin from the defendant. The exhibits were envelopes like those used herein. Various notations made by the Narcotics Agents concerning the purchases and the circumstances under which they were made appeared on the envelopes. The defendant there also claimed as error the admission into evidence of certain other exhibits prepared by the government chemist who made analyses of the heroin. Such exhibits also consisted of envelopes like those involved herein on which the chemist had recorded his findings. There, as here, the exhibits were prepared out of the defendant's presence and contained conclusions of the government witnesses which were in the jury's province to determine. There the court, after classifying all of the exhibits as "clearly hearsay and inadmissible unless within an exception to the hearsay rule", found that the exhibits or memoranda made by the chemist were admissible as having

been made in the regular course of business. 28 U.S.C.A. § 1732. The court found, however, that the exhibits or memoranda made by the Narcotics Agents did not come within any exception to the hearsay rule and that the receipt of them was error. After referring to the fact that under Rule 52(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., harmless error should be disregarded, the court stated at page 700:

> " * * * The error in this case however was compounded by the fact that the jury was permitted, over objection by the defendant, to have the exhibits in the jury room during its deliberations. *The jury thus had before it a neat condensation of the government's whole case against the defendant. The government's witnesses in effect accompanied the jury into the jury room.* In these circumstances we cannot say that the error did not influence the jury, to the defendant's detriment, or had but very slight effect." (Emphasis supplied.)

As in Ware, we feel that here it was error to receive the exhibits with the objected-to legends written thereon and then to direct their being taken to the jury room for use during the jury's deliberations. In Ware, the majority of the court found no error in the receipt of the chemical analyses. There was, however, a strong dissent by Circuit Judge Schnackenberg who, while he fully agreed with the majority that it was reversible error to receive the exhibits containing the memoranda written by the Narcotics Agents, felt that it was likewise error to admit the chemist's notations of his analyses. Under the circumstances of this case, we find it unnecessary to draw a distinction. Again, applying the teaching of Kotteakos v. United States, supra, we must conclude that the receipt of Exhibits 2 and 3 was prejudicial and may have influenced the jury and affected the outcome of the trial. As to the effect on the jury of the receipt of improper evidence where credibility is the major issue, see Olender v. United States, 9 Cir., 1954,

210 F.2d 795, 808, 42 A.L.R.2d 736, certiorari denied 352 U.S. 982, 77 S.Ct. 382, 1 L.Ed.2d 365, rehearing denied 353 U.S. 989, 77 S.Ct. 1280, 1 L.Ed.2d 1147.

In view of the fact that this case must be reversed and remanded for a new trial, we find it unnecessary to comment on the other alleged errors.

In both the District Court and in this court the appellant was represented by court-appointed counsel who, with meticulous care, attempted to protect the appellant's rights at every step. We express to counsel appreciation for the unremunerated assistance they have rendered to the appellant and to this court.

Reversed and Remanded.

VAN OOSTERHOUT, Circuit Judge (specially concurring).

I agree with the view expressed in the majority opinion to the effect that error was committed in receiving detailed hearsay testimony from the witness Payne over appropriate objection. The question of whether the error is prejudicial is a close one. The Government made out a submissible case, but it is a rather thin one. I am persuaded by the majority opinion that the judgment should be reversed and the case remanded for new trial because of prejudicial error in receiving the hearsay testimony of the witness Payne.

I have serious doubt whether the court committed error with respect to permitting the jury to take out the Exhibits Nos. 2 and 3 in the absence of any appropriate objection on the part of the defendant to such action. It is clear the defendant knew the exhibits were being sent to the jury room. The introduction of the envelopes was part of the chain of evidence tending to identify the sample seized with that examined by the Government chemist. If appropriate objection had been made to sending these exhibits to the jury room, the court might well have kept such exhibits from the jury or limited the consideration to be given by the jury to the writing upon the exhibits. I find it unnecessary to determine this issue and limit my concurrence to the hearsay error.