**UNITED STATES of America**

v.

**Mary TREADWELL.**

**No. CR 82–45.**

United States District Court, District of Columbia.

June 20, 1984.

---

William Pease, Stephen Spivack, Melanie Dorsey, Asst. U.S. Attys., Washington, D.C., for plaintiff.

John Nields and Robert Joseph, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN GARRETT PENN, District Judge.

The defendant, together with four other persons, was charged in a thirty-count, thirty-two page indictment filed on February 22, 1982, with conspiracy (18 U.S.C. § 371), false statements (18 U.S.C. § 1001), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and tax evasion (26 U.S.C.

§ 7201). The charges against the other four persons named in the indictment, Robert E. Lee, Joan M. Booth, Charles W. Rinker, Jr., and Ronald S. Williams, have been disposed of; Lee, Booth and Williams entered pleas of guilty to certain counts, and the Government dismissed the charges against Rinker.

The defendant filed a pretrial motion to dismiss Counts 18 through 22, and Count 24 of the indictment, charging her with mail fraud. The Court granted that motion after concluding that the "mailings did not further the objectives of the alleged scheme, did not conceal the alleged fraudulent representations, and did not assure the success of the alleged scheme." *United States v. Treadwell*, 566 F.Supp. 80, 83 (D.D.C.1983). *See also United States v. Maze*, 414 U.S. 395, 405, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974); *United States v. Alston*, 197 U.S.App.D.C. 276, 283, 609 F.2d 531, 538 (1979), *cert. denied*, 445 U.S. 918, 100 S.Ct. 1281, 63 L.Ed.2d 603 (1980). The case thereafter went to trial before a jury. The remaining mail fraud count was dismissed without objection before the case was sent to the jury. The jury found the defendant guilty of eight counts, including the count charging conspiracy and seven counts of false statements, and found the defendant not guilty of the remaining counts, which included charges of false statements, wire fraud and tax evasion.

The case is now before the Court on the defendant's post trial motions, one being a motion to dismiss the indictment or, in the alternative, to allow defendant's counsel to inspect the grand jury minutes, and the other being a motion for judgment of acquittal or, in the alternative, for a new trial. The Court heard arguments by counsel, and has carefully considered the record in this case, including the briefs filed by the parties, including the defendant's supplemental brief filed in late January 1984. After giving careful consideration to the motions, and the oppositions thereto, the Court concludes that the motions should be denied.

## I

Very briefly, the indictment alleges that the defendant, as a director and/or chief executive officer of P.I. Properties, Inc., Pride International, Inc., Sticks and Stone, Inc., Youth Pride Economic Enterprises, Inc., Pride Economic Enterprises Special Police, Pride Environmental Services, Inc., T. Barry Associates, Inc., and Youth Pride, Inc., entered into a conspiracy with the other named defendants, in which the object was for the defendants to "unjustly and illegally enrich themselves and the other businesses which they directed and controlled, by using P.I. Properties to acquire Clifton Terrace and thereafter to misappropriate, misapply, divert and steal monies and assets from Clifton Terrace and the other housing projects which P.I. Properties owned or managed and to hide, conceal and coverup such misappropriation, misapplication, diversion and theft. The property owned or managed by P.I. Properties was Clifton Terrace Apartments, a three building housing complex consisting of 285 rental units located at 1308, 1312 and 1315 Clifton Street, Northwest, in the District of Columbia, which from in or about April 1974 to in or about June 1975 was owned by the Department of Housing and Urban Development (HUD) and managed by P.I. Properties or its predecessor Pride International, and from in or about July 1975 to in or about August 1978 was owned and managed by P.I. Properties. The other properties consisted of Buena Vista Apartments, a 54 unit apartment complex located at 3223 and 3229 Buena Vista Terrace Southeast, and on Shipley Terrace Southeast in Washington, D.C., which was owned by Pride Economic Enterprises and on or about November 1974 to on or about July 1977 was managed by P.I. Properties, and the Kenesaw Apartments, an 85 unit apartment complex located at 3060 16th Street, Northwest, which complex was owned by the Antioch School of Law and from May 1976 to about September 1977 was managed by P.I. Properties.

The indictment further alleges that as a part of the conspiracy, in order to acquire

control of the assets and monies of Clifton Terrace and to mislead HUD, the defendants formed P.I. Properties as the successor to Pride International so as to comply with HUD's requirement that the proposed negotiated sale of Clifton Terrace be to a nonprofit entity. It further alleges that the defendants negotiated and contracted with HUD by falsely and fraudulently representing that P.I. Properties, as a nonprofit entity, would manage, purchase and operate Clifton Terrace as a multifamily housing development dedicated to the use and enjoyment of low and moderate income tenants for a period of at least 20 years from the date of purchase, and that the defendants applied for, received and maintained tax exempt status for P.I. Properties by falsely and fraudulently representing to the Internal Revenue Service (IRS) that, among other things, P.I. Properties was a nonprofit corporation organized "exclusively for charitable and education purposes", that "no part of the net earnings of P.I. Properties would inure to the benefit of any private individual, employee or director" and that the activities of other profit and nonprofit businesses directed and controlled by the defendants were "unrelated to those envisioned for P.I. Properties" and that P.I. Properties was completely financially accountable to the federal government and would provide the government free access to the project, its books, and other data. It was further alleged that a further part of the conspiracy was to bring the monies, assets and personnel of Clifton Terrace, Buena Vista and Kenesaw under the management and control of P.I. Properties and to misappropriate, misapply, divert and steal monies and assets of Clifton Terrace, Buena Vista and Kenesaw and other tenants by various methods including, using Clifton Terrace operating funds to purchase and pay for goods and services for the use and benefit of the defendants personally and of other businesses which the defendants directed and controlled, by withdrawing and using income and operating funds of Clifton Terrace for the personal use and benefit of defendants and others, by entering into deceptive and self-dealing contracts and agreements between P.I. Properties and the other businesses which defendants directed and controlled, by applying for loans for the use and benefit of Clifton Terrace in the name of P.I. Properties and converting the proceeds of such loans to the use and benefit of the defendants personally and of the other businesses which defendants directed and controlled, by personally withdrawing and improperly pledging as collateral for personal and business loans, monies deposited in various escrow accounts held in trust for the tenants of Clifton Terrace, Buena Vista and Kenesaw for the payment of taxes, and by improperly loaning monies from accounts held in the name of P.I. Properties and Clifton Terrace to the defendants personally and to the other businesses which the defendants directed and controlled. The indictment further charged that the defendants used a number of methods to hide, conceal, and cover up their alleged misappropriations, misapplications, diversions and theft of monies and self-dealing relationships between P.I. Properties and the other businesses which defendants directed and controlled by various methods. Some of the methods included, (1) routinely and purposely transferring and laundering monies through and between various P.I. Properties and other businesses and personal bank accounts, (2) creating and maintaining and directing others to create and maintain false, fraudulent and misleading business and financial books, records and reports, (3) altering, destroying and secreting various business and financial books and records, (4) making, preparing and submitting and causing others to make, prepare and submit to HUD and IRS false, fraudulent and misleading statements, representations, reports and correspondence, thereby also forestalling or preventing governmental investigations or audits, and (5) refusing, delaying, limiting and denying governmental officials free access to the Clifton Terrace project, its books and other data relating to other businesses which the defendants directed and controlled.

The indictment alleged 50 overt acts which the defendants committed in furtherance of the conspiracy.

At the conclusion of the trial, the jury found the defendant guilty of count 1 charging conspiracy, and guilty of seven counts charging false statements. The defendant was found not guilty of all other charges.

## II

■ One motion filed by the defendant seeks to have the Court dismiss the indictment or, in the alternative, to require the Government to permit the defendant's counsel to inspect the minutes of the grand jury which returned the indictment against her. This request is based on the defendant's argument that she (the defendant) learned, only after jeopardy attached, that "the Government's key witness, Zellane Laney, perjured herself before the grand jury in a manner highly material to the charges returned." The Court finds that the motion lacks merit.

The "dismissal of an indictment is only required in. extreme situations, as where the prosecutor *knowingly* presents perjured testimony." *United States v. Tham*, 665 F.2d 855, 863 (9th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 466 (1982) (emphasis this Court's). Here, there is no evidence whatsoever that the prosecutors knowingly presented perjured testimony to the grand jury. Indeed, there is no finding that Laney's testimony before the grand jury amounted to perjury; although evidence was presented to the trial jury that her testimony differed in certain aspects from what she told the grand jury. Counsel for the defendant brought this out during trial and emphasized it during his closing arguments. And, during instructions, the Court instructed the jury on the proper use of the grand jury testimony if the jury found that Laney's testimony at trial had been successfully impeached.

■ The grand jury can act on testimony which in a trial would be incompetent evidence. *United States v. Levine*, 700 F.2d

1176, 1179 (8th Cir.1983). There is no "rule permitting defendant [ ] to challenge [the] indictment [ ] on the ground that [it is] not supported by adequate and competent evidence." *Costello v. United States*, 350 U.S. 359, 363–364, 76 S.Ct. 406, 409, 100 L.Ed. 397. (1956). The defendant has the opportunity to defend at trial and is then "entitled to a strict observance of all rules designed to bring about a fair verdict." *Id.*

Finally on this point, "so long as the Grand Jury itself is not 'tainted' in the sense that it was improperly constituted, or that its members were necessarily biased, its actions, if valid on their face, are valid." *Coppedge v. United States*, 114 U.S.App. D.C. 79, 83, 311 F.2d 128, 134 (1962), *cert. denied*, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963) (citation omitted).

The Court can find no basis for either dismissing the indictment in this case, which has already been fully presented before a trial jury, or requiring the Government to produce the grand jury minutes for inspection by the defendant's counsel. So much of the motion as requests dismissal is without merit because the defendant has made no showing that Laney committed perjury when she testified before the grand jury, or for that matter, during the trial. And, clearly, there is no evidence that if she committed perjury, the government *knowingly* presented that testimony before the grand jury. So much of the motion as requests the minutes for inspection by defendant's counsel is without merit for the same reasons. Moreover, the motion to inspect is untimely, since the defendant could have raised those issues during the trial when Laney was still on the stand. The defendant's counsel had a weekend to review Laney's grand jury testimony, and by her counsel's own statements, they had done so and had carefully weighed the matters set forth in the transcript. Although the defendant may dispute Laney's testimony, the fact is that there has been no showing that there was not *some* evidence to sustain the indictment. 114 U.S.App. D.C. at 83, 311 F.2d at 134.

Finally, the defendant was not prejudiced by the grand jury testimony. Defendant's counsel had a full opportunity to exploit Laney's alleged inconsistent statements, and "the critical and final place to detect perjury is on trial when the witness must face the accused before the world and expose [herself] to the rigors of cross-examination and other hazards including contempt." 114 U.S.App.D.C. at 83, 311 F.2d at 134. Laney was called as a witness, placed under oath, and in due time subjected to the persistent and severe cross examination of defendant's well qualified and well prepared counsel. Every statement she made was placed in the trial crucible and probed and tested before the jury. In weighing Laney's testimony, the jury had the benefit of a transcript of Laney's sworn testimony before the grand jury. It had the opportunity to carefully weigh her testimony and motives, a matter which it is clear this jury did not take lightly. Defendant cannot now be heard to complain because her indictment is not dismissed, or because she is not granted a new trial, or because the jury did not choose to believe her testimony.

The motion is without merit and must be denied.

### III

■ The defendant contends that "the submission to the jury by the Government of documents not in evidence requires the grant of a new trial". This part of her motion relates to two documents which were made available to the jury during at least some of the time they were deliberating their verdict in this case. One document is a summary of the testimony of FBI Agent Philip Buvia which is entitled, "Summary of Specific Items from June 1976 Schedule A, B, and C" (hereinafter referred to simply as the Summary). The agent testified as to everything in the Summary, but the Summary was never offered in evidence. After final instructions and after a request by the jury for the evidence, all of the exhibits were sent to the jury room including the Summary. On July 15,

1983, at approximately 7:00 p.m., the Court received the following note from the jury:

July 15, 1983

We have encountered a document entitled, "Summary of Specific Items from June 1976 Schedules A, B, C." stuck in a folder for August 1977 A, B, C, Report Schedules. We question as to whether this document was received into evidence, and therefore whether the jury should consider it.

In response to the above note, the Court immediately sent the following reply:

July 15, 1983

To the Jury:

Please send the document to me by the Marshal and do not review the document until you receive further instructions from me.

You may continue your deliberations.

Within a few minutes the Deputy Marshal returned to the Court with the document. Once the document was received it was reviewed with counsel and it became apparent that the document was not in fact in evidence. The defendant moved for dismissal of the false statement counts but that motion was denied. The defendant did not move to dismiss counts one or two, and she did not move for a mistrial on either of those counts.

The defendant's motion was denied after the Court heard argument by counsel and after the Court compared the Summary with the transcript of Agent Buvia's testimony. The Summary was consistent with the Agent's testimony, and it contained nothing which was not included in the testimony of the Agent. Some of the information set forth in the Summary had also been included in the testimony of Zellane Laney.

At that time, the Court concluded that there was nothing in the Summary, which if seen by the jury, would cause prejudice to the defendant. At most, the Summary was cumulative of the testimony given by the Agent. The Court also found that the

document was inadvertently sent to the jury.[1]

The Court heard arguments on the defendant's motions on the evening of July 15, 1983 and the morning of July 16, denied the motions on July 16 and sent the following note to the jury:

July 16, 1983

To the Jury:

The document you sent to the Court yesterday is not in evidence. You must not consider it during your deliberations.

The second document at issue is a letter dated February 1, 1977 from Nathan Wasser, an attorney, to James Clay, then Area Director of the Department of Housing and Urban Development (HUD). That document, a copy of which is now marked as Court Exhibit 5, was allegedly found by counsel for the defendant on August 8 or 9, 1983, when they were reviewing the two boxes of original Government exhibits which had been submitted to the jury. The defendant's counsel state in their memorandum in support of their motion, that their review of the documents was conducted in the Courtroom Division of the Clerk's Office under the supervision of one or two deputy clerks. Court Exhibit 5A, is Mr. Wasser's letter. Attached thereto is Court Exhibit 5B, which is a draft of a letter which was eventually sent to Mr. Clay by the defendant on February 9, 1977. The original of the letter was received in evidence as Government Exhibit 191. When that exhibit was offered in evidence, it was offered without objection by the defendant.

Initially, the Court must observe that the defendant has misstated the issue as to the three documents. The defendant argues that she is entitled to a new trial because of the *"submission* to the jury by the *Government* of documents not in evidence" (emphasis the Court's). Of course, the fact is that the Government did not submit the documents to the jury at all.

Neither the Government nor the defendant submitted any documents to the jury, and neither party had any contact with the jury.

Second, while the defendant asserts that the Summary was sent to the jury "with the Government Exhibits", it has not been established whether counsel for the Government or counsel for the defendant had possession of the document just prior to the documents being boxed for submission to the jury. Both parties had access to the exhibits before they were submitted to the jury, and counsel for both parties examined and used the exhibits during the course of the trial, and counsel for both parties removed and reinserted various exhibits in and out of the many exhibit folders during the course of the trial. Moreover, keeping in mind the thousands of documents in this case, hundreds of which were admitted into evidence, it seems reasonable to conclude that the document was inadvertently placed with the exhibits admitted into evidence and thereby found their way to the jury. There is no evidence that the documents were deliberately commingled with the evidence.

The leading case on the receipt by the jury of documents or other materials not actually admitted into evidence is *Dallago v. United States*, 138 U.S.App.D.C. 276, 427 F.2d 546 (1969). The defendant argues that *Dallago* indicates that the Court grant the motion for a new trial in this case. This Court disagrees.

The facts in *Dallago* are as follows: The defendant was charged with violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. During the trial, certain portions of the files of the Security and Exchange Commission (SEC) were admitted into evidence pursuant to an agreement of counsel, acquiesced in by the Court, with the understanding that those portions which were not admitted would be

---

**1.** It would appear from notations on the document, that the document, which had been inspected and used by both sides during the course of the trial, was last in the hands of counsel for the Government. The Court is satisfied beyond a doubt however, that it was sent to the jury by mistake, and that counsel for either side may have inadvertently mixed the documents with the evidence in the case.

removed from the files before the evidence was submitted to the jury. In addition, the Court had agreed that although the indictment would be submitted to the jury, paragraph 17 would be deleted therefrom. Through inadvertance, the deletions were not made from the SEC files before they were sent to the jury room. The material improperly submitted to the jury included a suspension order and also included a copy of the original indictment which included paragraph 17.

With respect to the submission of the unredacted indictment, the Court upon learning that it had been erroneously sent to the jury, recalled the jurors and instructed them to disregard paragraph 17. A redacted indictment was then sent to the jury.

As to the suspension order which was erroneously sent to the jury, that order contained allegations that the offering circular prepared by the defendant or on behalf of the defendant contained untrue statements of material facts and also suggested that other statements were misleading. The concluding paragraph of the order stated that the offers were made in violation of the law. The Court of Appeals concluded that the conviction in *Dallago* rested, "to a substantial degree" on the jury's assessment of the credibility of the witnesses which was not "one sided on that score". 138 U.S.App.D.C. at 289, 427 F.2d at 559. The Court noted that material more sensational than that submitted to the jury in *Dallago* need not compel reversal where it is *merely cumulative* of other strong evidence in the case, but further noted that in *Dallago*, the additional material was not merely cumulative. Rather, the statements erroneously submitted to the jury referred to "evidence of illegal activity by a company allegedly controlled [by the defendant] and deeply involved in the offenses charged." *Id.*, U.S.App.D.C. at 289–290, F.2d at 559–560. The prosecution in that case summed up the case as one involving "fraud and misrepresentation and deceit" and "dishonesty in the business community". The court concluded that the suspension order was "well calculated to

reflect upon him [the defendant]" as having filed other false statements.

The facts in the instant case are distinguishable. In *Dallago*, the court had ruled, after hearing from counsel, that the suspension order would not be admitted into evidence. That ruling suggests that the trial court had already found that the material was prejudicial to the defendant and that it should not be seen by the jury. Coupled with the above ruling, was another ruling by the court sustaining the defendant's objection that paragraph 17 should not be included in the copy of the indictment sent to the jury. Thus, the submission of the documents was in direct contravention of the Court's order. Obviously, the trial court had determined that the submission of the documents would be unduly prejudicial and unfair to the defendant long before the documents were given to the jury. With that background, the fact that the trial court later ruled that the submission of the documents to the jury was not such error as to necessitate a new trial, is of little moment in view of its prior ruling.

These are not the facts in this case. First, with respect to the Buvia Summary, there is nothing before the Court which suggests that the Summary was ever considered by the jury, indeed, the opposite is true. The jurors, in taking inventory of the documents, came across the Summary and were concerned whether it was actually in evidence. Thus they asked, "whether the jury should consider it". They were immediately advised by the Court not to do so and the document was turned over to the United States Marshal who delivered it to the Court. While the Court of Appeals in *Dallago* had every reason to believe that the *Dallago* jury had "examined" the documents, just the opposite is true here. The Treadwell jury stopped and requested instructions concerning the document. It seems obvious that under this statement of facts, the defendant could not have been prejudiced.

Second, even if the jury had considered the Summary, and this Court is satisfied that the jury did not, it cannot be said that the error was "so potentially detrimental to [defendant] as to necessitate a new trial." 138 U.S.App.D.C. at 285, 427 F.2d at 555. The *Dallago* document had already been ruled inadmissible and the jury had not seen them during the trial nor heard testimony concerning the information contained therein. Moreover, the suspension order in *Dallago* clearly reflected on the credibility of the defendant's witnesses and additionally contained evidence suggesting another crime. Here, the information contained in the Summary was presented to the jury during the trial, without objection by the defendant, and there is no suggestion that the evidence was inadmissible or prejudicial. At the very most, it can be argued that the evidence would have been cumulative *if examined by the jury*. The *Dallago* court has suggested that cumulative evidence without more is insufficient to result in an order for a new trial.

■ *Dallago* does not stand for the proposition that, any time extraneous material is erroneously submitted to the jury, the defendant is automatically entitled to a new trial. The submission of such material to the jury raises serious questions, but the determination of whether it must result in a new trial does not rest upon that fact alone. Rather, that determination must be based upon all of the surrounding factors and circumstances in the case. *See Sawyer v. United States*, 112 U.S.App.D.C. 381, 303 F.2d 392 (1962) (erroneous submission to the jury of document not admitted into evidence would not lead to reversal of conviction where evidence of guilt was overwhelming).

Turning to the Clay draft letter, Court Exhibit 5B, it is not clear how or when that exhibit was placed in the box containing the Government's exhibits. It is also unfortunate that defendant's counsel were unable to pinpoint exactly where the exhib-

it was found since this might have given some clue as to how it came to be found among the exhibits.[2] As in the case of the Summary, the Court concludes that the exhibit was inadvertently commingled with the evidence submitted to the jury. The Court also assumes that the exhibit was not admitted into evidence since it is not specifically identified on the exhibit list.

The Clay draft letter, like the Summary was not an exhibit which was determined to be inadmissible by the Court, therefore, unlike *Dallago*, there was no prior ruling on whether it was admissible or prejudicial. In fact, the Clay draft letter is a draft of Government Exhibit 191 which was received in evidence without objection by the defendant. Thus, like the Summary, it is at most cumulative. Indeed, there are only slight differences between Government Exhibit 191 and the Clay draft letter, and the fact that the jury may have reviewed and considered those differences would not prejudice the defendant.

It is also significant that the defendant has been unable to articulate any ground upon which the Court can conclude that the Clay draft letter was prejudicial to the defendant. Simply stated, it was not prejudicial. Both the final letter (Government Exhibit 191) and the Clay draft letter (Court Exhibit 5B) set forth various complaints which the defendant had against HUD in that agency's handling of the Clifton Terrace project, and further sets forth the view that HUD was the cause for many if not all of the problems at Clifton Terrace. Both letters might well be considered self-serving statements by the defendant, or self-serving statements made on behalf of the operators of Clifton Terrace.

The defendant cites several cases in addition to *Dallago* which she contends supports her request for a new trial. One such case is *United States v. Adams*, 385 F.2d 548 (2d Cir.1967). In *Adams*, the defendant was charged with selling cocaine to an undercover agent. During the course

---

**2.** Although it is not known where defendant's counsel found Court Exhibits 5A and 5B, when the Court Clerk thereafter examined the exhibits she found the above two exhibits between Government Exhibit 675 and Government Exhibit 676.

of the trial, the Government offered three lock-sealed envelopes in which the agent had delivered the drugs to the examining chemist. The face of the envelope bore handwritten notations by the agent which essentially summarized the *entire* Government case against Adams. When defendant's counsel objected to the "self-serving written statements" on the envelope, the Government noted that it was really not offering those notations, but was merely offering the signature of the agent. The notations on the envelope set out the name of the defendant, his alias, his address, the amount of drugs received from Adams, and the amount paid therefor, the date of the transaction, and the witnesses to the alleged transaction. While the envelope was received in evidence, the notations thereon were not.

Sometime after the jury began deliberating, the Court received a note requesting, among other things, the locked sealed envelopes. Defendant's counsel again objected to the notations on the envelope, but the prosecution contended that the agent had testified and that if the jury believed the agent, there would be no problem. The trial judge thereafter announced that he would send the exhibits to the jury, and when defendant's counsel renewed his objection that the writings were not in evidence and not admissible, the trial court noted, "if it is not in evidence, it is now", and sent the envelopes to the jury. 385 F.2d at 550.

The Court of Appeals reversed the conviction and ordered a new trial citing *United States v. Ware*, 247 F.2d 698 (7th Cir. 1957) and *Sanchez v. United States*, 293 F.2d 260 (8th Cir.1961) as authority therefor. The court concluded that the notations on the envelopes were not admissible and noted that the "principle that the jury may consider only matters that have been received in evidence is so fundamental that a breach of it should not be condoned if there is the slightest possibility that harm could have resulted." 385 F.2d at 550–551. The Court did not really set forth why it felt the defendant would be prejudiced and why the submission of the evidence

amounted to other than harmless error, but the answers to those questions are probably found in the court's citation to *Ware* and *Sanchez*.

The facts in *Ware* were similar to those in *Adams*. In a narcotics case, the jury was allowed to see the agent's notations on the evidence envelope. The *Ware* court, like the court in *Adams*, found that the written statements were not admissible, but then went on to determine whether the error was harmless. *See* Fed.R.Crim.P. 52. The court noted that the argument that the error was harmless was based on the Government's contention that the agent had testified to those facts, and that the person who wrote the statements in question, was present in court and subject to cross examination. The Government also argued that there was "overwhelming evidence" of the defendant's guilt. The Court of Appeals rejected the argument however because it concluded, that when the statements were submitted to the jury, the jury "had before it a neat condensation of the Government's *whole* case against the defendant." 247 F.2d at 700 (emphasis the Court's). The court further observed that, "[t]he Government's witness in effect accompanied the jury into the jury room." *Id.*

In *Sanchez*, the trial court admitted the hearsay testimony of an agent concerning a conversation the agent had with an informer, on the grounds that it was merely cumulative of the informer's later testimony where the Government refused to vouch for the credibility of the informer and made it clear that no reliance was placed on the informer's testimony. 293 F.2d at 265. The Court of Appeals reversed however, noting that the hearsay statements attributable to the informer directly contradicted the defendant's testimony in the case.

The above cases are distinguishable from the instant case. First, by the statement of its foreman, the jury in this case advised the Court and counsel that it did not consider the agent's Summary. Indeed, when they viewed the document, the jurors were

not sure it was in evidence and asked for further instructions. As noted above, they were immediately advised to turn the document over to the Marshal and to continue with their deliberations. The following day, they were further advised that the document was not in evidence and that it should not be considered by them. Thus, with respect to the Summary, unlike the cases in *Adams, Ware,* and *Sanchez,* the jury did not consider the evidence. Moreover, even if the jury had considered the Summary, it was cumulative of the testimony of the agent and was far from a condensation of the Government's whole case against the defendant. As to the Clay draft letter, Court Exhibit 5B, it was not prejudicial, in fact, if anything, it was favorable to the defense in that it set forth the defendant's complaints against HUD, which complaints the defendant also made in open court when she testified before the jury.

The Court concludes then that *Dallago* does not support the argument that a new trial should be or must be granted in this case. The question presented must be decided based upon the sum total of all of the circumstances and facts in the case. The submission of the two exhibits was harmless error. The jury did not consider the Summary, and thus could not have been prejudiced by that document. Even if it had reviewed the Summary, the information contained therein was merely cumulative of other evidence heard by the jury. The Court must assume that the jury did view the Clay draft letter. That letter was almost identical to a letter properly before the jury, Government Exhibit 191, an exhibit which was admitted without objection by the defendant, and if anything, the exhibit supported the defendant's contentions. The defendant suffered no prejudice.

In short then, the defendant would not have been prejudiced by the jury's consideration of the challenged documents. All of the information, the documents even if considered by the jury, added nothing to the evidence or instructions already before the jury. *See United States v. Siragusa,*

450 F.2d 592, 595 (2d Cir.1971). In view of the above, so much of the defendant's motion as is based on the erroneous submission of the Summary and the Clay draft letter to the jury must be denied.

IV

The defendant argues that the Court should not have given the *Pinkerton* instruction. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). First, the Court notes that the defendant did not really argue at trial that the *Pinkerton* instruction should not be given, but rather argued that it should be given in a different version than that submitted by the Government.

■ Second, the Court is satisfied that the instruction as given was proper under the facts of this case, and further that this case is distinguishable from *United States v. Sperling,* 506 F.2d 1323, 1341–1342 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), cited by the defendant. Briefly stated, *Pinkerton* is a rule of vicarious liability which recognizes that the overt act of one member of the conspiracy is attributable to the other partners in crime. In *Sperling,* the Court was concerned that the inverse of what was involved in *Pinkerton* was at work; in other words that the conspiracy could be inferred from the evidence of the substantive crime rather than the reverse.

Here, the instruction given by the Court was quite clear since the jury was advised to determine whether the Government had established beyond a reasonable doubt that the defendant was a member of the conspiracy. In this connection, the Court in giving the *Pinkerton* instruction specifically referred the jury to its conspiracy instruction and advised them that if they should find the defendant guilty of the conspiracy then she could be found guilty of a substantive crime committed in furtherance of the conspiracy, provided it was foreseeable by her, even if she did not commit the acts constituting that offense. Under the Court's instruction, and indeed,

under the facts of this case, the jury was not permitted to infer the conspiracy from the evidence of the substantive offenses.

There seems little or no question that the jury was able to follow these instructions since the defendant was found guilty of some counts of false statements and not guilty of others, and since she was found not guilty of wire fraud. The jurors obviously did not understand the instruction to be that if the defendant was convicted of conspiracy, that they were required to find her guilty of all of the substantive offenses.

■ The court which authored the opinion in *Sperling* also distinguished that case from a case decided two years later. *See United States v. Corr*, 543 F.2d 1042, 1049–1050 (2d Cir.1976). The *Pinkerton* instruction remains viable in the Second Circuit as well as in this circuit, see *United States v. Bridgeman*, 173 U.S.App.D.C. 150, 170, n. 20, 523 F.2d 1099, 1119, n. 20 (1975), and in other circuits, *United States v. Finazzo*, 704 F.2d 300 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983).

■ In sum, the Court finds that the *Pinkerton* instruction was a proper instruction in this case under the facts of this case, and that the instruction properly informed the jury of the law of vicarious liability. So much of the motion for a new trial or for judgment of acquittal as is based upon giving the *Pinkerton* instruction is denied.

## V

The Court finds that the other arguments made by the defendant in support of her motion for judgment of acquittal or in the alternative for a new trial warrant little comment.

■ The defendant argues that the Court should grant her motion for judgment of acquittal on the ground that the evidence does not support the verdict. This argument must be rejected because there was sufficient evidence upon which the jury could find the defendant guilty beyond a reasonable doubt. The jury must consider all of the evidence and weigh the credibility of the witnesses and consider any justifiable inferences based on proven facts. *Curley v. United States*, 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). To state it differently, the Court is required to grant the motion only if, after considering all of the evidence, the Court concludes that there must be a doubt in a reasonable mind. *Id.* The Court cannot make such a determination in this case. *See also, Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Staten*, 189 U.S.App.D.C. 100, 581 F.2d 878 (1978).

■ Next, the defendant argues that the Court should reject the testimony of Zellane Laney and, in effect, strike her testimony. This argument also lacks merit. Although it is true that there were differences in her testimony given at trial and that given before the grand jury, there appeared to be little difference insofar as the substantive facts were concerned. Moreover, as the Court noted earlier in Part II, *supra,* the defendant had ample opportunity to exploit perceived differences, and to argue those differences to the jury.

■ The contention that the tax counts should have been severed is also without merit and is rejected for the reasons set forth in this Court's earlier ruling in this case. *See United States v. Treadwell*, 566 F.Supp. at 83–87. As the Court noted, there is a substantial difference between the facts in this case and those reported in *United States v. Halper*, 590 F.2d 422 (2d Cir.1978). In the latter case, the fund charged in the tax evasion indictment was not the same fund as that involved in the Medicare fraud. 566 F.Supp. at 87. Here, the Government's theory was that the same funds were involved in the conspiracy count and that it was those funds that were unreported on the counts charging defendant with tax evasion. The fact that the jury found the defendant not guilty of tax

evasion, does not necessarily result, as the defendant suggests, because there was no connection between the alleged stolen money and the tax counts. The defendant testified that she was under the belief that IRS had access to her bank records, and that this was another means of keeping records for IRS. Based upon that testimony the jury could have a reasonable doubt as to whether she attempted to *evade* the payment of the tax. In any event, this Court cannot find that the inclusion of the tax counts prejudiced the defendant since she was found not guilty of those counts. The initial decision made by the Court in its earlier opinion, *United States v. Treadwell, supra,* was sound.

Finally, the defendant contends that the Court's instructions were in error. The Court has given full consideration to that argument as well as the opposition filed by the Government. The Court concludes that those instructions are consistent with the law in this circuit and that so much of the motion which attacks those instructions must be denied.

In sum, the Court finds that *all* of the defendant's arguments are without merit and must be rejected.